STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

15-267

STATE OF LOUISIANA IN THE
INTEREST OF R.V., N.V., R.L., AND N.V.

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 13-17457
HONORABLE CHARLES L. PORTER, DISTRICT JUDGE

**********

PHYLLIS M. KEATY
JUDGE

**********

Court composed of John D. Saunders, Elizabeth A. Pickett, and Phyllis M. Keaty,
Judges.

AFFIRMED.

S. Marie Johnson
Public Defender's Office
106 W. Berard Street
St. Martinville, Louisiana 70582
(337) 394-1446
Counsel for Appellant:
    K.V. (mother)

**Charlotte Grandpre Bordenave**
**Mental Health Advocates**
**302 Dulles Street, Room U-47**
**Lafayette, Louisiana 70506**
**Counsel for Appellees:**
    **R.V. (child)**
    **N.V. (child)**
    **R.L. (child)**
    **N.V. (child)**

**Lewis H. Pitman**
**Public Defender's Office**
**106 W. Berard Street**
**St. Martinville, Louisiana 70582**
**Counsel for Appellee:**
    **J.V. (father)**

**M. Bofill Duhé**
**District Attorney**
**Angela B. Odinet**
**Assistant District Attorney**
**St. Martin Parish Courthouse**
**415 Main Street**
**St. Martinville, Louisiana 70582**
**(337) 394-2220**
**Counsel for Appellee:**
    **State of Louisiana**

**KEATY, Judge.**

This matter stems from a child in need of care case involving four minor children.  Following a December 8, 2014 Permanency and Case Review Hearing, the trial court granted judgment in favor of the State of Louisiana, through the Department of Children and Family Services ("DCFS" or "the agency"), changing the primary case plan goal of reunification to one of adoption, with the secondary goal of reunification.  K.V.,[1] the mother of the children, appeals.[2]  For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

R.V., N.V., R.L., and N.V.[3] were placed in the custody of DCFS pursuant to a verbal instanter order issued on December 18, 2013, and adjudicated children in need of care on February 5, 2014.  The following excerpt is taken from a June 17, 2014 DCFS report that was provided to the trial court in advance of a June 27, 2014 Review Hearing concerning the four children:

> **Reasons Child Entered Foster Care:**
> On November 6, 2013, the [DCFS] received a report with allegations of Neglect by Dependency, Lack of Supervision and an inadequate supply of food.  Mrs. [K.V.] has an extensive history with the agency including: six (6) valid findings of Neglect in 11/03, 8/06, 3/08, 4/08, and 4/11.  In addition, she has participated in the agency's Family Services Program three (3) times: 8/06-11/07, 2/08-6/08 and 1/11-8/11 due to dependency, Lack of Adequate Supervision and Drug Affected Newborn.  Also, the parents were involved with the Services to Parents program in 6/08 regarding [J.V.,] II, a previous child.  The agency received two (2) reports on Mrs. [K.V.]; one was made on November 6, 2013 with allegations of Neglect/Dependency, Lack of

---

[1] Pursuant to Uniform Rules—Courts of Appeal, Rules 5–1 and 5–2, the initials of the parties will be used to protect and maintain the privacy of the minor children involved in this proceeding.

[2] J.V., who is K.V.'s husband and the father of R.V. and the older female N.V., did not appeal the December 8, 2014 judgment.

[3] R.V., a male, was born on May 16, 2010; N.V., a female, was born on August 27, 2004; R.L., a male, was born on June 16, 2006; and N.V., a male, was born on December 17, 2013.

Supervision and Inadequate Food and the other report on December 18, 2013. The allegations were being investigated[] when the agency received the report on December 18, 2013[,] stating that Mrs. [K.V.] gave birth to a substance exposed newborn on December 17, 2013. Mr. [J.V.], Mrs. [K.V.'s] husband, was incarcerated and unable to ensure supervision, protection, and safety of the minor children. Mr. [T.M.], the alleged named father of [R.L.] does not have contact with the family, neither does he supply support to the family to aid in supervision, protection[,] and safety of the minor children.

The first case plan that was formulated on January 22, 2014, after the children came into the state's custody, had a goal of reunification and required K.V. and J.V. (hereafter "the parents") to secure and maintain housing that is physically safe and meets the basic needs of the children, which entailed maintaining the same home for six months, maintaining a food supply, keeping the home clean, and refraining from having convicted felons and/or drug users as guests or residents in the home. The parents were told to make themselves available for home visits by a case worker. They were also told to secure employment and provide proof of income to DCFS. The parents were directed to acquire healthy coping mechanisms, including appropriate anger management and age-appropriate parenting skills. In this regard, the parents were told to undergo psychological evaluations, to be cooperative and honest with the evaluators, and to follow through with any treatment recommendations. The parents were also directed to undergo substance abuse evaluations, to submit to random drug screens, and to obtain sponsors and attend Narcotics Anonymous (NA) and Alcoholics Anonymous (AA) meetings. The goal of this part of the case plan was to enable the parents to understand the affects substance abuse had on their ability to parent and to allow them to maintain sobriety to provide stability for themselves and their children. Finally, the parents were directed to attend and complete a DFCS-

2

approved parenting program. The January 22, 2014 Case Plan listed the SDM Risk Level[4] as "very high."

When DCFS completed a Case Plan Review on May 13, 2014, both parents were unemployed and had failed to provide the agency with any income documentation. In addition, neither parent had completed the recommended psychological evaluation. Also, the parents had twice failed to attend their scheduled substance abuse evaluations, and they had stopped attending AA and NA meetings. It was noted that the parents had not yet been referred to the Extra Mile Resource Center parenting program because DCFS did not want to overwhelm them. Nevertheless, the parents had located and maintained housing that was free of safety hazards for approximately three months, and they had made themselves available for visits from the agency. Although the SDM Risk Level remained "very high," the May 13, 2014 Case Plan continued the original goal of reunification with the parents.

The record contains a CASA (Court Appointed Special Advocate for children) Confidential Court Report dated June 27, 2014. According to the report, K.V. had submitted to urine and hair screenings in November 2013 that were positive for amphetamines and methamphetamines. After K.V. gave birth to N.V., her third drug-affected newborn, on December 17, 2013, her urine tested positive for amphetamines, and the infant's urine tested positive for amphetamines at birth. K.V. stated at the time that she was abusing illegal substances and that her drug of choice was methamphetamines. The report noted that during the six months that

---

[4] SDM stands for Structured Decision Making. The SDM system in a comprehensive case management system used by child protective services which facilitates risk assessments to reduce the incidence of subsequent harm to children and to facilitate timely and expeditious achievement of permanency, including reunification when safe to do so. Source: *Children's Research Center, a division of the National Council on Crime and Delinquency.*

the children had been in the State's custody, neither parent had made any significant progress in their case plans. As a result, CASA did "agree with the goal of reunification for the three older children, but only if both parents have completed their respective case plans and have received all of their substance abuse treatment." However, CASA recommended that the infant, N.V., be allowed to be adopted by his foster parents who had raised him since birth.

In a November 25, 2014 DCFS report that was provided to the trial court in advance of the December 8, 2014 Review Hearing, the agency had switched its primary goal for the children to adoption with a secondary goal of reunification. At that time, DCFS noted that the parents had not completed all aspects of their case plan. More specifically, it was noted that the parents had only maintained adequate housing since September 2, 2014, rather than for the recommended minimum of six months. K.V. remained unemployed and J.V. had been employed at his current job for two months rather than for the recommended six-month minimum. The report explained that K.V. had been diagnosed with manic depressive disorder and bipolar disorder after an October 2014 mental health assessment. In addition, the report stated that K.V. continued to use illegal substances and had not cooperated with substance abuse treatment. Further, although J.V. had been instructed to complete a mental health assessment after expressing symptoms of depression, he had failed to do so. DFCS noted that the two oldest children, R.V. and N.V., appeared to be happy with their foster family and were both on the honor roll at school. Although R.L. had originally been placed with his older siblings, he had recently been moved to another foster home due to behavioral issues that were being monitored and would be addressed by a professional counselor if necessary. R.L. was doing well in school. Finally, it was

noted that the baby, N.V., had been provided with "a tremendous level of care" by his foster parents since his birth and that a bond had formed between them.

At the start of the December 8, 2014 Review Hearing, DCFS announced its recommendation that the custody of the four children remain with the State and that the primary plan goal was now adoption, with a secondary goal of reunification with the parents. Neither of the parents nor the attorney for the children objected to the children remaining in State custody, however, the parents objected to the primary goal being changed to adoption. J.V. was the first witness to testify. He stated that he had been employed as an operator's helper at A & T Well Service in Breaux Bridge for a month, that he had obtained housing, that he had finished Keys for Sober Living, and that all of his recent drug tests were negative. Nevertheless, J.V. admitted that he had missed several scheduled visits with the children, which he attributed to work conflicts. He also admitted that he had not finished the case plan's recommended anger management or parenting classes and that he had never undergone the mental health evaluation.

Markela Robertson, a DCFS employee who had been the four children's foster care worker since they had come into the State's care and who had authored the November 25, 2014 DCFS report, was the second witness to testify at the Review Hearing. Her testimony basically confirmed the contents of the report. In addition, however, she explained that the infant, N.V., was physically and developmentally "behind" and that he was K.V.'s third drug-affected newborn. Ms. Robertson also stated that one of K.V.'s children named "Joey" had previously been removed from her care. Upon questioning by the trial court, Ms. Robertson stated that, if the goal was changed to adoption, the parent's visitation with the children would decrease from biweekly to once a month but the children's visits

with each other would be unaffected. She confirmed, however, that the parents could continue to work their case plans and that the court could order reunification.

The third witness to testify at the December 8, 2014 Review Hearing was April Manuel, the foster mom of the youngest child, N.V. She explained that she and her husband could not pick him up from the hospital until he was five days old because he was going through withdrawals from the methamphetamine. She described him as a highly sensitive baby who would scream uncontrollably due to any type of stimulation and who was difficult to soothe. Ms. Manual confirmed that N.V. was "below the curve" both physically and developmentally, but stated that he is making progress with physical and speech therapy. She stated that since N.V. has been with her since birth, she knows his cues and how to prevent him from becoming inconsolable. Finally, Ms. Manual stated that after she picks N.V. up from visiting with K.V., he is very irritable, and it takes several hours for him to return to his "normal."

In closing arguments, counsel for the State acknowledged that while the parents had made progress, the best interest of the children would be served by maintaining permanency in their lives while the parents be allowed to continue to complete the goals of their case plans.

At the close of the Review Hearing, the trial court ruled:

> The decision of the Court is to adopt the recommendation of the agency, make adoption the primary goal and reunification concurrent which is not the end of this situation or circumstance. It hopefully signals to the parents that they have to increase their, their [sic] work with the case plan to complete, complete [sic] the case plan. And at all stages they still have opportunities to show their good works and to convince the Court that reunification is the best interest of the children. The Court believes that the agency has established reasons for the Court to adopt the recommendation.

Written judgment was signed on December 8, 2014, confirming the change of the primary case plan goal of reunification to one of adoption, with the secondary goal of reunification, and setting a Permanency and Case Review Hearing for June 4, 2015.

K.V. appealed. In her sole assignment of error, she contends that the trial court erred in granting DCFS's "request to change the primary case plan goal of reunification to that of adoption and establishing the secondary goal of reunification."

## DISCUSSION

### *Law*

Louisiana Children's Code Article 1036, entitled "Proof of parental misconduct," provides, in pertinent part:

C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

In *State ex rel. H.A.S.*, 10-1529, pp. 11-12 (La. 11/30/10), 52 So.3d 852, 859 (quoting *State ex rel. K.G. and T.G.,* 02-2886, pp. 4-5 (La. 3/18/03), 841 So.2d 759, 762) the supreme court stated:

> In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship. However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing those interest[s], the courts of this state have consistently found the interest of the child to be paramount over that of the parent.

"We review a trial court's determination as to whether parental rights should be terminated according to the manifest error standard of review." *State in Interest of M.A.N.*, 12-946, p. 3 (La.App. 3 Cir. 12/28/12), 106 So.3d 288, 290-91.

> Louisiana Children's Code Article 1015 sets forth eight grounds for termination of parental rights. Although the State need only establish one ground for termination, the trial court must also find that the termination is in the best interest of the child in order to meet the statutory requirement of La.Ch.Code art. 1035(A), which requires that grounds for termination be proven by clear and convincing evidence.

*State in the Interest of J.K.G.,* 11-908, pp. 5-6 (La.App. 3 Cir. 1/11/12), 118 So.3d 10, 14-15.

Although the procedural posture of this appeal is atypical in that K.V.'s parental rights have not yet been terminated, Ms. Robertson informed the trial court that DCFS's next step in this matter would be to seek termination of K.V.'s and J.V.'s parental rights. Thus, we will apply the manifest error standard of review in determining whether the trial court erred in changing the primary case plan goal to adoption.

A key component of her case plan was that she submit to a substance abuse evaluation and random drug screens. According to the June 17, 2014 DCFS report, K.V.'s hair tested positive for amphetamines and opiates on February 24, 2014 and April 23, 2014. On May 21, 2014, her urine tested positive for benzodiazepines, methamphetamines, and amphetamines. On June 17, 2014, K.V.'s urine tested positive for methamphetamines, amphetamines, and two other illegal substances. The November 25, 2014 DCFS report documented that in the six urinalyses that K.V. had between July and November of 2014, she had tested positive for Hydrocodone and Hydromorphone. The report explained that those opioid pain medications had been prescribed to K.V. because she needed a hip replacement. In addition, the November 25, 2014 DCFS report noted that after her October 2014 diagnosis of manic depressive and bipolar disorders, K.V. was also prescribed Zoloft, an antidepressant, and Seroquel, an antipsychotic.

As the record demonstrates, K.V. obviously struggles with substance abuse issues as she has given birth to three drug-affected newborns. Given her history, K.V.'s prescribed medications will need to be closely monitored to prevent any possible abuse. In addition, while J.V. has secured employment and he and K.V. have obtained stable housing, they have not maintained either for the required six months. Accordingly, we find no manifest error in the trial court's decision that changing the case plan permanency goal to adoption was in the children's best interest. Our decision is bolstered by the trial court's pronouncement on the record that K.V. and J.V. were encouraged to complete their case plan and return to court with evidence that the children's best interest would be served by being reunified with them. Moreover, this result properly places the children's best interests above their parents' interests while not precluding the parents' ability to finish their case

9

plan to ensure that any future reunification will be "secure, stable, long-term, and [with] continuous relationships found in a home with proper parental care." *State ex rel. H.A.S.*, 52 So.3d at 859.

## DECREE

For the foregoing reasons, the judgment of the trial court changing the primary case plan goal of reunification to one of adoption, with the secondary goal of reunification, is affirmed. All costs of this appeal are assessed against K.V.

**AFFIRMED.**