# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 19-254


## STATE IN THE INTEREST OF R.B., J.B., & N.W.



**********


APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 2018-JU-15
HONORABLE THOMAS DUPLANTIER, DISTRICT JUDGE

**********

## PHYLLIS M. KEATY
## JUDGE

**********

Court composed of John D. Saunders, Phyllis M. Keaty, and Jonathan W. Perry,
Judges.


**AFFIRMED.**

**Saunders, J., dissents with written reasons.**



**Kasey L. Pharis**
**Kasey Pharis, L.L.C.**
**100 South Louisiana Street, Suite 500**
**Abbeville, Louisiana 70510**
**(337) 254-5387**
**Counsel for Appellant:**
        **B.B. (mother)**

**Keith Stutes**
**District Attorney**
**Aimee F. Hebert**
**Assistant District Attorney**
**100 North State Street, Suite 215**
**Abbeville, Louisiana 70510**
**(337) 898-4320**
**Counsel forAppellee:**
        **State of Louisiana, Department of Children & Family Services**

**Melanie Addy**
**Acadiana Legal Services**
**Post Office Box 4823**
**Lafayette, Louisiana  70510**
**(337) 237-4320**
**Counsel for R.B., J.B., & N.W. (children)**

**Nicole Guidry**
**100 South State Street, Suite 500**
**Abbeville, Louisiana  70510**
**(337) 740-8885**
**Counsel for G.B. (father)**

**Robert Lounsberry**
**Post Office Box 119**
**Gueydan, Louisiana  70542**
**(337) 223-0704**
**Counsel for C.W. (father)**

**KEATY, Judge.**

The mother, B.B.,[1] appeals the trial court's judgment ordering the continued custody of her three minor children with the State of Louisiana, Department of Children and Family Services (DCFS), and eventual adoption. For the following reasons, the trial court's judgment is affirmed.

**FACTS & PROCEDURAL HISTORY**

The mother, B.B., and the father, G.B., together produced two male children, R.B., who was born on April 18, 2013, and J.B., who was born on September 22, 2014. B.B. and a different father, C.W., together produced one female child, N.W., who was born on September 17, 2017. The mother was in a relationship with both fathers. All three adults live together in a home with other adults and children. On January 30, 2018, the DCFS received a report of sexual abuse. The report alleged that G.B. fondled his two children along with another child that lived in the house. Upon investigation, the children revealed that their father put his hand in their pants and fondled them multiple times. They also disclosed that G.B. fondled a sixteen-year-old male who visited the home. According to the report, R.B. exhibited a large bruise on his left cheek and contusions on his body. R.B. advised that he had been whipped really hard by his mother's boyfriend. J.B. revealed that he had been choked by his mother's boyfriend. The report noted that the home had a strong, foul odor and clothes, toys, and papers were scattered throughout. According to the report, the home had electricity but lacked running water.

Pursuant to an oral instanter order on January 31, 2018, the children were removed from their home and placed in the temporary custody of the DCFS. On February 1, 2018, a written instanter order with supporting affidavit containing the

---

[1] Pursuant to Uniform Rules—Courts of Appeal, Rules 5–1 and 5–2, the initials of the parties will be used to protect and maintain the privacy of the minor children involved in the proceeding.

information regarding the investigation of the reported claims was filed and signed by the trial court. On February 7, 2018, a continued custody hearing occurred, after which the trial court signed a formal judgment maintaining custody with the DCFS, which was stipulated to by the parents. On that same date, the State filed a Petition to Declare Child in Need of Care, alleging that the children were victims of abuse. According to the petition, the children were neglected, lacked adequate supervision, and were victims of criminal sexual activity. The allegations were denied by the parents at the answer hearing on February 21, 2018. Thereafter, the trial court ordered continued custody with the DCFS.

The adjudication hearing occurred on April 25, 2018, wherein the parents stipulated without admission to the allegations contained in the petition. The children were adjudicated as children in need of care, and the trial court ordered continued custody with the DCFS. The written judgment advised the parents of the case review and permanency review procedure along with their obligation to cooperate with the DCFS and to comply with all of the case plan's requirements. According to the judgment, failure to comply with the case plan could result in termination of parental rights. N.W. was subsequently placed with paternal relatives in Calcasieu Parish, and R.B. and J.B. were placed in separate certified foster homes.

Multiple permanency and case review hearings occurred wherein the trial court was presented with a case plan and progress reports. Initially, the DCFS formulated a court-approved case plan outlining a strategy for reunification between the parents and the children. However, at the case review hearing on January 3, 2019, the trial court found that it was in the children's best interest to change the primary goal to adoption rather than reunification because of the parents' inability to complete the case plan. According to the trial court, the parents' inability arose from the mother's physical limitations along with the "incarceration and mental

health of father." The mother, B.B., appealed the trial court's judgment finding that she was not in substantial compliance with the case plan.

On appeal, B.B. contends that:

1.  The trial court committed manifest error in finding that B.B. was not in substantial compliance.

2.  The trial court committed manifest error in its determination of reasonable efforts pursuant to La. Ch.C. article 702.

3.  The trial court committed manifest error in changing the primary goal to adoption where the trial court, the State, and the Department of Children and Family Services ("DCFS") failed to account for delays due solely to DCFS, its service providers, or adjacent agencies.

4.  The trial court committed legal error in changing the primary goal to adoption where the State and DCFS failed to develop a new case plan reflecting a change in goal and failed to provide a new case plan to the parties and failed to file a new case plan in the record.

5.  The trial court committed legal error in failing to account for B.B.'s adaptive skills and assistive resources.

6.  The trial court committed legal error in failing to apply to [sic] provisions of the Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504") to make and require reasonable modifications to policy in a reasonable accommodation of Appellant's disability and delays in assistive services provided by the State.

**STANDARD OF REVIEW**

In Louisiana, the manifest error standard of review is utilized in "determining whether the trial court erred in changing the primary case plan goal to adoption." *State in Interest of R.V.*, 15-267, p. 8 (La.App. 3 Cir. 5/27/15), 165 So.3d 416, 422. In order to reverse a fact finder's determination under the manifest error standard of review, "an appellate court must undertake a two-part inquiry: (1) the court must find from the record that a reasonable factual basis does not exist for the finding of the trier of fact and (2) the court must further determine the record establishes the

3

finding is clearly wrong." *Brewer v. J.B. Hunt Transp., Inc.*, 09-1408, 09-1428, p. 12 (La. 3/16/10), 35 So.3d 230, 239.

## DISCUSSION

### I.     First Assignment of Error

In her first assignment of error, B.B. contends that the trial court committed manifest error in finding that she was not in substantial compliance with the case plan.

Lack of parental compliance with a case plan may be shown by one or more of the following:

> (1) the parent's failure to attend court-approved scheduled visitations with the child; (2) the parent's failure to communicate with the child; (3) the parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services; (4) the parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan; (5) the parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan; (6) the parent's lack of substantial improvement in redressing the problems preventing reunification; and, (7) the persistence of conditions that led to removal or similar potentially harmful conditions.

*State in Interest of E.M.J.*, 52,082, p. 10 (La.App. 2 Cir. 4/11/18), 249 So.3d 170, 176 (citing La.Ch.Code art. 1036(C)).

In its written reasons, the trial court noted that the DCFS case plan was in the children's best interest because of the parents "continued inability to complete case plan including physical limitations of mother" and "incarceration" and "mental health of father." In its oral reasons for judgment, the trial court held that B.B. lacked housing, sufficient income, and family help or intervention from some other source to assist her in taking care of the children.

The trial court's finding was based upon the testimony of DCFS caseworkers Ellen Bennett and Mandy Hebert. Bennett testified that the children had been in

4

foster care for approximately twelve months, during which time the parents failed to gain appropriate housing. According to her, C.W. and B.B. live with B.B.'s mother in a house unsuitable for the children because other children reside there and the house contains "holes in the floor and things of that nature." Bennett testified that B.B., who suffers from cerebral palsy, was approved for in-home services by the Office for Citizens with Developmental Disabilities (OCDD). Those services have not been utilized because B.B. has not chosen a provider, according to Bennett. She noted that because of B.B.'s physical limitations, assistance is needed when handling N.W. Bennett advised that B.B.'s monthly social security income amounts to $771.00. According to Bennett, B.B. had not completed parenting classes although she was projected to finish. Bennett testified that C.W. remains unemployed despite being denied twice for disability benefits.

Hebert revealed that R.B. and J.B. reside in separate, certified foster homes whereas N.W. resides with C.W.'s sister and brother-in-law, Michelle Willis and Brett Romero. Hebert's primary concerns regarding the children were lack of housing, lack of a support system, and lack of sufficient income. She testified that B.B.'s monthly income made it "difficult to raise a family of five." Hebert recommended that B.B. gain employment especially if she can get services through OCDD. According to Hebert, OCDD wants to speak directly with B.B., "so she's got to take that initiative to call them and talk to them." Hebert also stated that G.B. is incarcerated and, as such, has not completed his case plan.

It is clear from the record that the trial court did not commit manifest error in ruling that B.B. had not completed her case plan. Although she successfully completed a large portion of the case plan, there were still issues that remained unresolved. Accordingly, this assignment of error is without merit.

5

## II.     Second Assignment of Error

In her second assignment of error, B.B. contends that the trial court committed manifest error in its determination of reasonable efforts pursuant to La.Ch.Code art. 702.

Louisiana Children's Code Article 702 (emphasis added) governs permanency hearings and provides, in pertinent part:

> B.     The court shall conduct a permanency hearing within nine months after the disposition hearing if the child was removed prior to disposition or within twelve months if the child was removed at disposition, but in no case more than twelve months after the removal. Permanency reviews shall continue to be held at least once every twelve months thereafter until the child is permanently placed or earlier upon motion of a party for good cause shown or on the court's own motion.
>
> C.     The court shall determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with the following priorities of placement:
>
> . . . .
>
> E.     Except as otherwise provided in Article 672.1, the court shall determine whether the department has made ***reasonable efforts*** to reunify the parent and child or to finalize the child's placement in an alternative safe and permanent home in accordance with the child's permanent plan. The child's health and safety will be the paramount concern in the court's determination of the permanent plan.

In its written judgment, the trial court found that the DCFS made reasonable efforts, based upon the health and safety of the children, to finalize the permanent plan. Its individualized findings regarding reasonable efforts were "[h]ousing [and] inability to physically handle needs of children." The trial court noted that the DCFS made reasonable efforts to find a suitable relative placement for the children but had found none to be appropriate except for the youngest child.

The trial court's finding was based, in part, on Hebert's testimony that the children "are doing well." According to Hebert, N.W. was physically and developmentally behind but was getting on task with the help of Early Steps. She

revealed that N.W. was bonding with her caregivers. Hebert advised that J.B. will begin therapy soon. She testified that R.B., who initially did not need therapy, was scheduled to be reassessed for counseling after he began exhibiting behavioral issues. Hebert further advised that both boys are seeing Dr. Howes. She revealed that J.B. is receiving speech therapy whereas R.B. was referred to speech therapy "and the school system is addressing that."

It is clear from the record that the trial court did not commit manifest error in its determination of reasonable efforts pursuant to La.Ch.Code art. 702. The testimony reveals that the children were receiving services pertaining to their health and safety while in the custody of the DCFS. Testimony reveals that the DCFS assisted B.B. in getting assistance from the OCDD; however, B.B.'s actions and/or inactions prevented her from obtaining the services. Moreover, "[m]ere cooperation by a parent is not the sole focus of a permanency plan. The court must assess whether the parent has exhibited significant improvement in the particulars that caused the State to remove the child from the parent's care." *State in Interest of E.M.J.*, 249 So.3d at 176. In this case, the children were removed from their parents' custody following allegations of inadequate supervision and neglect. Evidence of B.B.'s lack of housing, little income, and failure to obtain services from the OCDD for her physical disability shows that she has not exhibited significant improvement with respect to the particulars that caused the children to be removed initially. Accordingly, this assignment of error is without merit.

## III. Third Assignment of Error

In her third assignment of error, B.B. contends that the trial court committed manifest error in changing the primary goal to adoption where the trial court, the State, and the DCFS failed to account for delays due solely to DCFS, its service providers, or adjacent agencies.

At trial, both caseworkers testified that any delay in services by OCDD were the direct result of B.B.'s failure to make herself available by disconnecting her phone before moving homes and/or failure to contact them directly regarding a provider. Specifically, Bennett testified as follows:

> OCDD would not speak directly to me, for whatever reason, they wanted to speak directly to [B.B.]. So I gave the phone number to [B.B.] and asked her to call, and she did. She did do that. And she was able to get approval for services 40 hours per week. And at this point, she has to choose a provider. OCDD thought that she already had a provider, which she does not. So the next step is for her to choose a provider and that provider will come out to her house and provide services for her.

It is clear from the record that the trial court did not commit manifest error in changing the primary goal to adoption. The trial court found, based upon the caseworkers' testimony, that any delays in OCDD services were caused by B.B.'s actions of disconnecting her phone service and failing to call OCDD and speak to them directly in order to choose a provider. Accordingly, this assignment of error is without merit.

**IV. Fourth Assignment of Error**

In her fourth assignment of error, B.B. contends the trial court committed legal error in changing the primary goal to adoption where the State and the DCFS failed to develop a new case plan reflecting a change in goal, failed to provide the parties a new case plan, and failed to file a new case plan in the record.

Our review of the record reveals that at the permanency hearing, the State entered into evidence the DCFS court reports dated December 20, 2018 and December 21, 2018. Both court reports request a goal change to adoption based upon B.B. and C.W.'s failure to make significant progress in complying with their case plan. It is clear from the record that the trial court did not commit manifest

8

error in changing the primary goal to adoption. Accordingly, this assignment of error is without merit.

**V.     Fifth and Sixth Assignments of Error**

In her fifth assignment of error, B.B. contends that the trial court committed legal error in failing to account for B.B.'s adaptive skills and assistive resources. In her sixth assignment of error, B.B. contends that the trial court committed legal error in failing to apply the provisions of the Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504") to make and require reasonable modifications to policy in a reasonable accommodation of her disability and delays in assistive services provided by the State. B.B. explains that the ADA and Section 504 require reasonable modifications to rules, policies, and practices on the part of the DCFS. B.B. alleges that because of her disability and delays by OCDD, a reasonable modification should be an extension of the time with which to complete her case plan.

The trial court's oral ruling reveals that any modification or extension of time would not affect the outcome of the case plan recommendation of adoption. Specifically, the trial court stated:

> But more than that, the problem that I see in this case is on a long-term basis, and that is whether or not the mother is physically able to take care of the children. I'm not going to make that decision now, but I think that that's the thing that has happened since the beginning of this case, and I don't think OCDD can correct that; I don't know that the mom can correct that, without some substantial family help or intervention with some other source that she can convince the department, or I, that will be on a permanent basis to assist her in taking care of the children, not herself, which is OCDD's responsibility to help her, it's to help her then take care of her children. And that's the fine line that I think you're missing with the Disabilities Act and with this argument. I think that, yes, the department needs to help her because of her disability, but helping her doesn't then transfer into her ability to take care of her children from that help. She still doesn't have housing, she still doesn't have income that's -- and I don't think waiving the timelines is going to help in getting an income from seven hundred fifty

9

dollars ($750) to something that's going to be more stable or able to get housing, which she still hasn't done.

In this case, there lacks evidence indicating that granting a waiver of time would enable B.B. to comply with the case plan. The children were initially removed because of inadequate supervision and neglect. Evidence in the record reveals that B.B. cannot adequately supervise her children because of her failure to obtain assistance from the OCDD for her physical disability, lack of housing, and meager income. She has no resources, family or otherwise, to assist her in permanently caring for her children. Even if B.B. had received OCDD services, there is no evidence that such services would enable her to permanently care for her children. The record also shows that any delay in services rendered by OCDD for her physical disability resulted from B.B.'s actions and/or inactions. Accordingly, these assignments of error are without merit.

## DECREE

For the foregoing reasons, the trial court's judgment is affirmed.

**AFFIRMED.**

# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

# 19-254

**STATE IN THE INTEREST OF R.B., J.B. & N.W.**

**Saunders, J., dissents and assigns written reasons.**

In my view, the trial court abused its discretion in failing to modify or extend B.B.'s time in order to complete her case plan.  I feel this is an abuse of discretion because such an extension is a reasonable accommodation to B.B. given her disability.  Accordingly, I respectfully dissent.