HUGHES, J.
 

 |2This is an appeal from a juvenile court decision maintaining a plan of adoption for a minor child previously adjudicated a
 
 *32
 
 child in need of care. For the reasons that follow, we vacate and remand for further proceedings.
 

 FACTS AND PROCEDURAL HISTORY
 

 On March 27, 2006 the juvenile court judge signed an instanter order placing custody of the minor child D.T. (born February 1, 2006), his juvenile mother, A.T. (born December 21, 1992), and A.T.’s siblings, E.T. (born December 31, 1988) and T.T. (born March 20, 1990), in the custody of the State of Louisiana, Department of Social Services, Office of Community Services (“OCS”). The instanter order stated that despite OCS having provided preventative services to A.T.’s mother, A.T.J., police had been called to the family’s residence on more than three occasions in the two weeks preceding the instanter order and that the children had been unsupervised, neglected, and abused. There were allegations that A.T.J. had been living in a separate residence with her husband, leaving the children alone in the family home for extended periods of time. The instanter order further stated that A.T.J. and her husband had been arrested for domestic violence. Initially the thirteen year-old mother A.T. and her infant child, D.T., were placed together in the home of A.T.’s adult sister, Triwanna Primus. The Pri-mus home was later determined to be unsuitable for the continued custody of the children because of concerns about the condition of the home and the ability of Mr. and Mrs. Primus to adequately supervise and manage the behavior of the children. A.T. and D.T. were removed from the Primus home and placed in separate foster homes.
 

 A.T. and her siblings were adjudicated children in need of care on May 17, 2006. A.T. was placed in foster care in the home of Mrs. Kathleen |sSibley in Mt. Herman, Louisiana. Her child, D.T., was adjudicated a child in need of care on June 21, 2006 and placed with foster parents, Dennis and Tangi Trotter, in Kentwood, Louisiana, with weekly visitation granted to A.T.
 
 [2]
 
 OCS foster care worker Patricia Ricks testified as to the reasons for separating A.T. and D.T., as follows:
 

 [A.T.] and the baby were placed together. [A.T.] was not properly caring for the baby. [A.T.]’s behaviors warranted her and the baby being placed in separate homes. She is very immature. She needs parenting. She also has been — had a psychological eval and she has been diagnosed with adjustment disorder with depression, disturbance of emotions and conduct, plus low average intellectual functioning, so these things need to be worked on before she is — her and the baby are placed back together. They could have more visitation if that’s what [A.T.] wanted, but I think at the time of separation she did not express wanting to have more visitation with the baby.
 

 At the August 16, 2006 case review hearing, the court directed OCS to “devise a plan that will gradually place [D.T.] in the Sibley home within the next 6 months with [A.T.] exhibiting parental abilities.” A.T. was exercising visitation with D.T. and attending parenting classes and therapy. At that time, the case plan for D.T. was reunification with A.T.
 

 At the February 14, 2007 permanency hearing, the case plan goal of reunification for D.T. and A.T. was changed to adoption. OCS foster care worker Henrietta Palma-
 
 *33
 
 sano testified that OCS had been unable to transition placement of D.T. with his mother because of her behavior. A.T. was moved from Mrs. Sibley’s home in October 2006, on Mrs. Sibley’s request, “because of her violent and disr[e]speetful behaviors.” A.T. was then placed with her aunt and uncle, Curtis and Tracie Taylor, in Hammond, Louisiana, where she continued to display behavior problems in the home. While in the Taylor home, A.T. was truant from school, ran away from home, and refused |4to participate in therapy. A.T. told the foster care worker that she was embarrassed to discuss her situation with anyone and felt that because the children at school knew she had had a baby, they picked on her. A.T. also stated to the foster care worker that she loved her baby, but the worker observed that A.T. had not demonstrated the skills necessary to meet D.T.’s basic needs, and although she continued to visit with D.T., the visitation was difficult because D.T. cried for his foster parents and A.T. was unable to console him. The OCS foster care worker conceded that A.T. requested visitation with D.T., but questioned whether A.T. had the ability to learn to parent D.T. In approving the case plan goal of adoption for D.T., the court stated:
 

 I’m changing the case plan to adoption, but I’m just making it very clear she can continue to visit and do whatever she needs to do. Occasionally, a mother or a parent will, even after the case plan has been changed they will still sometimes demonstrate facts that lead us to change the case plan again.
 

 At the August 15, 2007 case review hearing, evidence was received that A.T.’s foster home had again changed. A.T. was removed from Mr. and Mrs. Taylor’s home on February 11, 2007 because of behavioral issues. She was placed in the certified foster home of Ms. Ada Horton in Frank-linton, Louisiana, where she was doing well until her sister, T.T., was placed there also. Then, A.T. became disrespectful to Ms. Horton, and she began to steal and destroy property, along with her sister and other residents. A.T. was arrested and charged with theft on May 15, 2007 and was incarcerated in the Florida Parishes Detention Center until June 22, 2007, when Ms. Horton bonded her out. Ms. Horton took A.T. back into her home, but would not take T.T. back. A.T.’s behavior in the foster home then improved, but she continued to be unreceptive to attending therapy sessions. A.T. continued to express her love for D.T. and desire to have him back with her. Visitation |swith D.T. was re-established after the interruption caused by A.T.’s moves and incarceration.
 

 A report was also submitted at the August 2007 review hearing from New Horizons Youth Services Bureau in Hammond (“New Horizons”), stating that A.T. was referred to them by OCS for parenting classes and other services. The New Horizons report stated that services were provided from September 20, 2006 until May 15, 2007 and included one assessment, five mentoring sessions, and six parenting sessions. The report stated that AT. was friendly, respectful, open, eager, and did a very good job in her parenting classes. The report indicated that A.T. did not complete the program because she moved.
 

 Additionally, during the August 2007 hearing, the court received the June 1, 2006 report of Brian G. Murphy, Ph.D., who performed a psychological evaluation of A.T. Dr. Murphy stated that A.T. was in the low average range of intelligence (as a result of sociocultural and environmental factors, as opposed to a learning disability), that she had suffered some physical and emotional abuse, and that as a result of her situation (including the anger and sadness she suffered from the removal of
 
 *34
 
 her child D.T.), she was experiencing an adjustment disorder with depression and recurring disturbance of emotions and conduct. Psychotherapeutic intervention was recommended.
 
 [3]
 

 At the February 13, 2008 case review hearing, OCS submitted evidence that on January 17, 2008 A.T. was placed in the home of her |fipaternal aunt, Linda Couzan, in Hammond, Louisiana, at the aunt’s request.
 
 [4]
 
 The OCS report further indicated that A.T. had improved “tremendously” since going to live with her aunt; she was making good grades in school, had a more positive attitude, was demonstrating the ability to make better decisions regarding herself and her son, attempting to bond with D.T. at each visit, taking parenting classes, and participating in therapy with Dr. Kerschbaum. The OCS foster care worker testified that because of these improvements the agency would consider changing the case plan goal back to reunification.
 

 Also, during the February 2008 hearing, the Court Appointed Special Advocate (“CASA”), Mary Cyprian, testified that A.T. had made a lot of positive changes since going to live with her aunt, Ms. Couzan, and that her behavior had changed. Ms. Cyprian stated that A.T. began to communicate with her, that A.T. gained a better understanding of her life and the seriousness of her situation, and that A.T. loved her baby. In her written report, Ms. Cyprian recommended placing D.T. in the Couzan home with his mother, A.T.
 

 Further, during the February 2008 hearing, A.T. requested, through counsel, to be allowed to talk to the juvenile judge in chambers to deliver a letter she had written. The letter was made a part of the record and in it A.T. stated how important her son was to her. A.T. expressed concern and regret that she had missed important milestones in her child’s life, such as his learning to crawl and walk, his first tooth, and his first words. A.T. also expressed remorse for her prior inappropriate behavior and explained how it came about, pointing to her difficult family situation (her father was | electrocuted in 2005, and afterwards her mother re-married and began to mistreat A.T. and her siblings). A.T. stated that it was her intention to work hard in school so that she could get a good job and do better for her son than her mother had done for her. A.T. stated that she wanted to have D.T. with her and to care for his needs. She expressed that not seeing D.T. “hurts deep in [her] heart.”
 

 However, despite the improving situation and the indication on February 13, 2008 that OCS would consider changing the case plan back to reunification, on February 28, 2008, OCS filed a petition for termination of the parental rights of A.T. and the putative father, D.J., citing LSA-Ch.C. art. 1015(4) and/or (5).
 
 [5]
 
 Contrary to
 
 *35
 
 its position at the February 13 case review hearing, OCS alleged in its position that there was no reasonable expectation of significant improvement in the parents’ condition or conduct in the near future. A court date of March 29, 2008 was set to receive the answer of the parents to the petition and trial of the matter was scheduled for April 16, |82008.
 
 [6]
 
 A.T. appeared in court on March 29, 2008 and denied the allegations of the petition (D.J. did not appear in court but a general denial was entered on his behalf).
 

 Subsequently, at a May 14, 2008 case plan review hearing, OCS recommended changing the case plan goal for D.T. from adoption back to reunification with A.T. In support of its recommendation, the OCS report gave the following reasons:
 

 [A.T] has improved remarkably and is expressing a desire to parent her son, [D.T.]. Due to the circumstances that took place previously with her having ungovernable behaviors and being a young mother who is dependent on her caretakers, she was not given an opportunity to parent. [A.T] has since cooperated with the agency and has met most of the goals of her case plan. [A.T.] does not want her son, [D.T.,] to be adopted. She expressed that she would like to regain custody of her son or have custody awarded to her aunt, Linda Couzan. Ms. Couzan has made a plan for [A.T.] and she want[s] to make a plan for [D.T.].
 

 [D.T.] has been placed with Dennis and Tangi Trotter since he was three months old. Dennis and Tangi Trotter have provided an excellent home for him. The home provides stability, structure, and nurturing for the child, and the agency recognize[s] at this juncture that the removal of the child from this foster home could be detrimental to the child’s well being. However, the agency feel[s] the need to determine if this young mother can parent this child since she is a minor, who had a difficult adolescent due to the death of her father in 2005 and suffered abuse and neglect by her mother in 2006 resulting in her becoming a ward of the state. At this time, [A.T.] is doing everything that is being asked of her by the agency in working her case plan. She has been placed with her paternal aunt, Linda Couzan since January 17, 2008 and her behavior has improved tremendously and she has been exhibiting a more positive attitude and her grades have improved in school to average and above. [A.T.] is partici
 
 *36
 
 pating in the Independent Living Skills Program and she has been demonstrating an ability to make better decision[s] in regards to herself and her son. [A.T.] has expressed to the foster care worker that she loves her son and she want[s] him reunited with her. She has been trying to bond with her son during the visits she [has] with him and if she is given increased visits with him she may be able to establish a bond with him. [A.T.] has participated in | parenting classes through Positive Steps and she has expressed a strong desire to parent her son or to be involved in parenting. Deanna Mathews, M.Ed., LPC, completed a psychosocial evaluation on [D.T.] and [A.T.] dated April 30, 2008 to assess their attachment and bonding.... According to Ms. Mathews, [D.T.] is attached and bonded to Mr. and Mrs. Trotter, and his removal from the home of the Trotters at this time will be detrimental to him. However, Ms. Mathews recommended that [D.T.] continue to have regular visitation with [A.T.] to determine if a bond could occur between the mother and child. Ms. Mathews further stated that [D.T.] need[s] to spend more quality time with [A.T.] and Ms. Couzan than [a] one-hour visit per week.
 

 The CASA report also recommended a change of the case plan goal from adoption back to reunification, with continued custody of D.T. in the Trotter home but increased visitation to A.T., with a view to changing custody to either A.T. or Ms. Couzan. After receiving evidence on the issue, the court took the matter under advisement. The juvenile court’s ruling was issued on June 18, 2008, and denied OCS’s request to change the case plan to reunification.
 

 On July 7, 2008, Linda Couzan filed a handwritten motion for appeal of the juvenile court’s decision. A counseled motion for appeal was filed on July 9, 2008 on A.T.’s behalf (stating that A.T. was appearing personally and “through her guardian LINDA COUZAN”).
 

 While the record was being prepared for appeal, an additional case review hearing was held on September 17, 2008. At that time an OCS report dated September 10, 2008 was filed into the record, which emphasized A.T.’s continued steps toward being able to meet D.T.’s basic needs. The OCS report indicated that A.T. was on a waiting list to take a “Second Steps Pai'-enting Program” and that A.T. had demonstrated her ability to cook, clean, and care for D.T.’s basic needs (specifying that A.T. had been observed cooking a meal of fried chicken and macaroni and cheese for D.T., | inand feeding, bathing, and dressing him). Although it was noted that D.T. cried when he was first separated from his foster parents for visitation, he was “okay” shortly afterwards. It was also noted that A.T. had been volunteering on Tuesdays and Saturdays during the summer at a CASA food bank and that she planned to continue volunteering on Saturdays when school started. It was further observed that a closer bond was developing between A.T. and D.T., who had called A.T. “Mom” on one occasion and regularly called her by her first name.
 

 A September 10, 2008 CASA report was also received by the court, which, in addition to the improvements recorded by the OCS report additionally noted that D.T. no longer showed signs of discomfort when he was left alone with A.T., and that D.T. had been very affectionate to A.T. and others around him.
 

 However, testimony was also received at the September 2008 hearing that A.T. had moved out of her aunt’s (Linda Couzan’s) home following a dispute. A.T. indicated that Ms. Couzan had sided with A.T.’s
 
 *37
 
 cousin “Shalisa” in a dispute that arose when Shalisa accused A.T. of taking her cologne. A.T.’s adult cousin, Neisha Taylor, stated that Ms. Couzan had said she would allow twenty-one-year-old Shalisa, who was staying with A.T. when Ms. Couz-an was at work, to “do whatever she want[ed] to do to [A.T.],” which Neisha believed included fighting or hurting A.T. OCS foster care supervisor Doris Baker testified that she had received a call from Ms. Couzan asking for A.T.’s removal from her home because A.T. was displaying behavioral problems, which allegedly included cursing, riding in a car with a twenty-seven-year-old man, sneaking men into Ms. Couzan’s home, and calling relatives to come over to fight Ms. Couzan. A.T. moved in with Neisha as of September 11, 2008. Neisha expressed her willingness |T1to provide a home for A.T. as long as A.T. continued to attend school. Neisha’s home was approved in a preliminary home study by OCS.
 

 LAW AND ANALYSIS
 

 Motion to Dismiss Appeal
 

 In response to this appeal, OCS filed a “Motion to Dismiss for Staleness or Exception to Jurisdiction for Failure to Comply with Time Restriction,” contending that although A.T.’s motion for appeal was timely filed, the appeal was not properly lodged because: the return date was not in accordance with LSA-Ch.C. art. 330, appeal costs were not paid, and A.T.’s motion to proceed
 
 informa pauperis
 
 was not filed by the return date. On December 17, 2008, this court ruled on the motion as follows:
 

 MOTION TO DISMISS DENIED IN PART, REFERRED TO PANEL TO WHICH APPEAL IS ASSIGNED IN PART. The part of the motion to dismiss the appeal as not timely lodged was not timely filed pursuant to La. C.C.P. art. 2161, and therefore, that part of the motion is denied. The part of the motion urging that the appeal is stale is referred to the panel to which the appeal is assigned.
 

 We re-affirm this action and particularly note that LSA-C.C.P. art. 2161 provides in part: “[A] motion to dismiss an appeal because of any irregularity, error, or defect which is imputable to the appellant must be filed within three days, exclusive of holidays, of the return day or the date on which the record on appeal is lodged in the appellate court, whichever is later.” OCS’s motion was filed on November 25, 2008, outside the time alloted by LSA-C.C.P. art. 2161.
 

 In its staleness argument OCS asserts that appellant’s failure to seek preferential docketing caused delay in the processing of this appeal, and that the issue on appeal is now moot and should not be reviewed. OCS points to ah additional hearing on the status of the child held September 18, 2008 and 112that the parties’ circumstances have changed since the appeal was taken. OCS further contends the judgment at issue is not an appealable judgment.
 

 With respect to the right to appeal the judgment at issue, LSA-Ch.C. art. 700 provides:
 

 A. At the conclusion of the case review hearing, the court may:
 

 (1) Approve the plan as consistent with the health and safety of the child and order compliance by all parties....
 

 (2) Find that the case plan is not appropriate, in whole or in part, based on the evidence presented at the contradictory hearing and order the department to revise the case plan accordingly.
 

 B. Any person directly affected may appeal the findings or orders of the
 
 
 *38
 

 court rendered pursuant to this Article.
 

 (Emphasis added.)
 

 The judgment appealed was rendered following a case review hearing and is therefore appealable.
 
 [7]
 

 Nor do we find any merit in OCS’s staleness or mootness argument. While appellant could have sought preferential docketing, the failure to do so is not fatal to her right to appeal. Further, even though additional rulings may have been made by the juvenile court subsequent to the ruling appealed herein, such is unavoidable, as a suspensive appeal cannot be taken in this instance.
 
 See
 
 LSA-Ch.C. art. 336. Moreover, the issue presently before this court has not been shown to be moot (as would be the case, for example, if the juvenile court had, since the time this appeal was taken, approved a case plan change from adoption to reunification as desired by appellant); nothing has been presented to this court indicating that the status of the case plan for D.T. has been altered.
 

 Accordingly, we deny OCS’s motion to dismiss this appeal.
 

 |
 
 ,3Propriety of Case Plan for Adoption
 

 On appeal, A.T. contends the juvenile court erred in denying OCS’s request, in which she joined, that her son’s case plan be changed from a goal of adoption to one of reunification. In support of her appeal, A.T. cites LSA-Ch.C. art. 101, which provides:
 

 The people of Louisiana recognize the family as the most fundamental unit of human society; that preserving families is essential to a free society; that the relationship between parent and child is preeminent in establishing and maintaining the well-being of the child; that parents have the responsibility for providing the basic necessities of life as well as love and affection to their children; that parents have the paramount right to raise their children in accordance with their own values and traditions; that parents should make the decisions regarding where and with whom the child shall reside, the educational, moral, ethical, and religious training of the child, the medical, psychiatric, surgical, and preventive health care of the child, and the discipline of the child; that children owe to their parents respect, obedience, and affection; that the role of the state in the family is limited and should only be asserted when there is a serious threat to the family, the parents, or the child; and that extraordinary procedures established by law are meant to be used only when required by necessity and then with due respect for the rights of the parents, the children, and the institution of the family.
 

 A.T. also points out that she was an abused teenage mother when she was taken into the custody of OCS along with her child, D.T., but that rather than providing her with the services she needed to assist her in growing as a parent to D.T., OCS separated her from her child. A.T. contends that when she and D.T. were taken into OCS custody, a suitable, safe, and permanent home should have been found where both she and her son could have been placed together. A.T. further asserts that the difficulties she has faced subsequently in seeking to be reunited with her
 
 *39
 
 son have resulted from this initial failure of OCS to find a suitable placement for her and her son.
 

 A well-settled principle is that the “the fundamental liberty interest of natural parents in the care, custody, and management of their child does not 114evaporate simply because they have not been model parents.” Reiterating this principle, the Supreme Court remarked that this liberty interest is “perhaps the oldest of the fundamental liberty interests.” A corollary principle is that in considering whether to terminate parental rights, a court must delicately balance the natural parent’s fundamental right and the child’s right to a permanent home.
 
 State ex rel. SNW v. Mitchell,
 
 2001-2128, p. 8 (La.11/28/01), 800 So.2d 809, 814-15 (citing
 
 Santosky v. Kramer,
 
 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599, 606 (1982) and
 
 Troxel v. Granville,
 
 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49, 56 (2000)).
 

 In removing a child from his parents, the following considerations, set forth in LSA-Ch.C. art. 682(A), are obligatory:
 

 The court shall not remove a child from the custody of his parents unless his welfare cannot, in the opinion of the court, be adequately safeguarded without such removal. Except as otherwise provided in Article 672.1,[
 
 8
 
 ] in support of any such disposition removing a child from the parental home, the court shall determine
 
 whether the department has made reasonable efforts
 
 to prevent or eliminate the need for removal of the child from his home and, after removal,
 
 to reunify
 
 the parent and child or to finalize the child’s placement in an alternative safe and permanent home in accordance with the child’s permanent plan including, if appropriate, through an interstate placement. The child’s health and safety shall be the paramount concern in the court’s consideration of removal.
 
 The department shall have the burden of demonstrating reasonable efforts.
 

 (Emphasis added.)
 

 |1frAs stated in Article 682, when a child is removed from the custody of his parents, the state must demonstrate that “reasonable efforts” have been made to “prevent or eliminate” the need for that removal, and,
 
 after
 
 a child has been removed from the custody of his parents, OCS must demonstrate that it has made “reasonable efforts” to “reunify” the parent and the child. Further, LSA-Ch.C. art. 675(B) requires that a case plan include, in addition to other items: “[a] plan for assuring ... that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents’ home, facilitate the safe return of the child to his own home or other permanent placement;” and “[djocumentation of the efforts the agency is making to safely return the child home or to finalize the
 
 *40
 
 child’s placement in an alternative safe and permanent home.”
 
 [9]
 

 “Reasonable efforts” means the exercise of ordinary diligence and care by department caseworkers and supervisors and shall assume the availability of a reasonable program of services to children and their families. LSA-Ch.C. art. 603(23). In order to constitute “reasonable efforts,” OCS must at least direct parents toward appropriate agencies that may be able to assist them in meeting their responsibilities with respect to their dependent children and/or in removing the impediments to reunification with their children.
 
 See State ex rel.
 
 A.T.,
 
 [10]
 
 2006-0501, p. 11 n. 8 (La.7/6/06), 936 So.2d 79, 86 n. 8.
 
 [11]
 
 A goal of terminating parental rights and placing a child for adoption is improper where OCS has failed to make reasonable efforts to reunite the child with his parents.
 
 State ex rel. A.T.,
 
 2006-0501 at p. 10, 936 So.2d at 85.
 

 In the instant case, the reasons given by OCS for removing D.T. from the custody of his parent, A.T., were provided via the testimony of OCS foster care worker Patricia Ricks. Ms. Ricks testified that A.T. was “not properly caring for the baby” and that A.T.’s “behaviors warranted her and the baby being placed in separate homes;” no specifics of these alleged failings appear in the record. Additionally, Ms. Ricks pointed out that A.T., who was only thirteen years old at that time, was very immature, needed parenting, and was suffering from emotional disturbances. Ms. Ricks stated that “these things need to be worked on before she ... and the baby are placed back together.” No testimony was given as to what “reasonable efforts” were made by OCS prior to removing D.T. from the custody of A.T.
 

 Furthermore, since D.T. and A.T. have been separated, the evidence in the record does not reflect that OCS has identified a particular problem and/or factor(s) that may have impeded the reunification of D.T. and A.T., with a view toward applying reasonable efforts to alleviate any such problem and/or factor. The record reflects only that A.T. at various times attended parenting classes and counseling sessions. There is no indication how A.T. was referred to these activities, whether by A.T. herself, her foster parents, or OCS. There is no direct evidence in the record that OCS provided or preferred A.T. for any services or programs specifically directed toward removing an impediment to reunification of A.T. with D.T. Thus, OCS failed to establish that reasonable efforts were made either to prevent the removal of D.T. from A.T.’s custody or to reunify this mother and child.
 

 Because the record fails to show that OCS undertook reasonable efforts to reunify A.T. and D.T., the juvenile court erred in failing to approve OCS’s proposal to
 
 *41
 
 change D.T.’s case plan goal from adoption back to reunification.
 
 See State ex rel. A.T.,
 
 2006-0501 at p. 11 n. 8, 936 So.2d at 86 n. 8.
 

 Nevertheless, we are mindful that D.T. has been in foster care most of his life and certainly longer than he was in the care of his mother. The primary concern of the state and the courts is to determine and insure the best interests of the child.
 
 State ex rel. J.M.,
 
 2002-2089, p. 11 (La.1/28/03), 837 So.2d 1247, 1254. In this case, the best interests of D.T. may mandate that he remain in the home of the foster parents with whom, according to the evidence in the record, he is psychologically bonded.
 

 Consequently, we find it appropriate to remand this matter to the juvenile court with instructions to exercise its power under LSA-Ch.C. art. 677 to require that the OCS case plan for reunification of A.T. and D.T. include a psychological evaluation of D.T., as well as any other relevant factors that may impact his best interests in relation to his physical custody and a goal of unification with A.T.
 

 CONCLUSION
 

 For the reasons assigned, the judgment of the juvenile court maintaining the OCS case plan of adoption is vacated, and the matter is remanded for further proceedings in accordance with the foregoing. All costs of this proceeding, in the amount of $870.50, are to be borne by the [ 18State of Louisiana, Department of Social Services, Office of Community Services.
 

 JUDGMENT VACATED; REMANDED FOR FURTHER PROCEEDINGS.
 

 McDonald and PETTIGREW, JJ., concur.
 

 [2]
 

 . Both A.T. and the putative father of D.T., D.J., stipulated to D.T.'s status as a child in need of care.
 

 [3]
 

 . This is the report apparently referred to by case worker Patricia Ricks at the adjudication as a child in need of care of D.T. on June 21, 2006; however, the record does not reflect that the court was provided with the full report at that time.
 

 [4]
 

 . Ms. Couzan had been living in California and had not been informed when her brother, A.T.’s father, died in an electrical accident immediately preceding the pertinent events giving rise to this case. She was also unaware that her brother's children had been placed in foster care until she returned to live in Louisiana.
 

 [5]
 

 .LSA-Ch.C. art. 1015 provides in pertinent part:
 

 The grounds for termination of parental rights are:
 

 (4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving
 
 *35
 
 him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
 

 (a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child's parent continue to be unknown.
 

 (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child’s care and support for any period of six consecutive months.
 

 (c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.
 

 (5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.
 

 [6]
 

 . It would appear that the trial was continued without date, though no definitive documentation appears in the record.
 

 [7]
 

 . Although no formal written judgment was signed in this case, LSA-Ch.C. art. 710(C) provides that an extract of the minutes of court specifying the findings of the court, which is signed by the court, "shall be considered a written judgment.” In the instant case, an extract of the pertinent minutes of court for June 18, 2008 was signed by the juvenile judge on June 26, 2008 and appears in the record.
 

 [8]
 

 . Louisiana Children’s Code Article 672.1 provides, in part:
 

 A. At any time in a child in need of care proceeding when a child is in the custody of the department, the department may file a motion for a judicial determination that efforts to reunify the parent and child are not required.
 

 B. The department shall have the burden of demonstrating by clear and convincing evidence that reunification efforts are not required, considering the health and safety of the child and the child’s need for permanency.
 

 C.Efforts to reunify the parent and child are not required if a court of competent jurisdiction has determined that:
 

 (1) The parent has subjected the child to egregious conduct or conditions, including but not limited to any of the grounds for certification for adoption pursuant to Article 1015.
 

 [9]
 

 . OCS has a burden of demonstrating by clear and convincing evidence that reunification efforts are not required, in accordance with LSA-Ch.C. art. 672.1(B).
 

 [10]
 

 . The party, '‘A.T.,” in the cited case is not the same person as the appellant "A.T.” in the instant case.
 

 [11]
 

 . It has been proposed that the following three-step defining process will improve reasonable efforts determinations in individual cases. The steps include: (1) identifying the exact danger that puts the child at risk of placement and that justifies state intervention; (2) determining how die family problems are causing or contributing to this danger to the child; and (3) designing and providing services for the family that alleviate or diminish the danger to the child. If any one of these steps is missing, it is unlikely that the efforts made on behalf of the family will be reasonable. Alice C. Shotton,
 
 Making Reasonable Efforts in Child. Abuse and Neglect Cases: Ten Years Later,
 
 26 Cal. W.L.Rev. 223, 225-26 (1989-1990).