# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

# 2022 CJ 0544

# STATE OF LOUISIANA

# IN THE INTEREST OF C.R.J. AND J.F.

Judgment Rendered: **NOV 1 7 2022**

\* \* \* \* \* \*

On Appeal from the Seventeenth Judicial District Court
In and for the Parish of Lafourche
State of Louisiana
Docket No. 14564

Honorable F. Hugh Larose, Judge Presiding

\* \* \* \* \* \*

Ms. Andrea Cheramie Stentz
Indigent Defender
Thibodaux, Louisiana
and
Jane Hogan
Hammond, Louisiana

Counsel for Defendant/Appellant
J.J., Mother of the Minor Children

Ms. Kristine Russell
District Attorney
Ms. Vanessa Zeringue
Mr. Joseph S. Soignet
Assistant District Attorneys
Thibodaux, Louisiana

Counsel for Plaintiff/Appellee
State of Louisiana

Linda. A. Mitchell
Thibodaux, Louisiana

Counsel for Plaintiff/Appellee
Department of Children & Family Services

Maura Toups
Mary R. Mustaller McMillan
Southeastern Louisiana Legal Services
Houma, Louisiana

Counsel for the Children/Appellees
C.R.J. and J.F., the Minor Children

\* \* \* \* \* \*

**BEFORE:  McDONALD, McCLENDON, AND HOLDRIDGE, JJ.**

Holdridge J, concurs with Reason

**McCLENDON, J.**

J.J., the mother of three minor children, appeals the trial court's ruling that removed the children from her custody. For the reasons that follow, we affirm in part and vacate in part.

## FACTS AND PROCEDURAL HISTORY

The State of Louisiana, Department of Children and Family Services (DCFS) received a report of alleged "Neglect / Drug Affected Newborn" on May 11, 2020,[1] concerning two children born to J.J.: C.J.,[2] born April 29, 2019, and Je.F.,[3] born May 8, 2020.[4] The report indicated that Je.F. tested positive for benzodiazepines at birth. After DCFS verified the allegations, the matter was transferred to Family Services on June 4, 2020.

On February 4, 2021, after receiving notice that J.J. was not in compliance with the terms of her Family Services plan, DCFS filed a request for an instanter safety plan order. The request was accompanied by a supporting affidavit executed by Twenica Singleton, a DCFS employee who had conducted the initial and ongoing investigation. According to Ms. Singleton, her initial investigation confirmed that J.J. had tested positive for THC, barbituates, and benzodiazepines at prenatal screenings on April 23, 2020 and April 30, 2020, prior to giving birth to Je.F. on May 8, 2020. Ms. Singleton attested that J.J. admitted "that she had a 'mini stroke' and got a Xanax from a friend[,]" and that she smoked THC during her pregnancy because "she had no appetite" and "smoking marijuana helped her to eat and sleep."

Ms. Singleton's affidavit also described concerns regarding whether J.J. was complying with her safe sleep agreement to ensure that newborn Je.F. slept safely in his bed. She attested that the Family Services worker observed Je.F. asleep in bed with his father on more than one occasion, and a collateral contact informed the Family

---

[1] We note that the affidavit contains a discrepancy regarding the date the report was received, stating in one place that the report was received on May 5, 2020, and in another that the report was received on May 11, 2020. As Je.F. was not born until May 8, 2020, it appears that the discrepancy was caused by a clerical error, and the report was received on May 11, 2020.

[2] To ensure the confidentiality of the children, all parties shall be referred to by their initials. See Uniform Rules—Courts of Appeal, Rules 5-1 and 5-2.

[3] As two of the three children bear the initials "J.F.," to minimize confusion, we include the second letter of each child's first name when referring to these children.

[4] The fathers of these two children were not parties to the proceedings underlying this appeal.

2

Services worker that Je.F. had fallen out of the bed on more than one occasion. Further, although J.J. was originally referred for "Family Functional Therapy Child Welfare" (FFTCW), that referral was altered due to ongoing substance abuse and unstable housing. J.J.'s alternative referral was for "Homebuilders [S]ervices with START Corporation" (Homebuilders).[5] Homebuilders made specific recommendations, including substance abuse treatment, mental health care treatment, re-referral to FFTCW, and compliance with DCFS and any additional referrals.

Ms. Singleton attested that, ultimately, J.J. completed Homebuilders on November 9, 2020, resumed FFTCW, and completed FFTCW on January 13, 2021. However, J.J.'s substance abuse continued throughout her participation in these programs. The Homebuilders therapist observed J.J. slurring her speech, drooling, and failing to keep her eyes open during sessions, causing the therapist to suspect that J.J. was under the influence of illegal substances or was misusing prescription medications. The Family Services worker also observed J.J. "to be under the influence of illegal substances" on September 17, 2020, and December 2, 2020. Consistent with the observations of the Homebuilders therapist and the Family Services worker, a hair drug screen conducted on September 24, 2020, was positive for amphetamines, ecstasy, methamphetamines, cocaine, and THC, and a urine drug screen was positive for amphetamines, methamphetamines, and marijuana. J.J. also verbally confirmed her ongoing substance abuse, as she contacted the Family Services worker on November 11, 2020, and stated that she "messed up" and "hit a blunt two times."

Ms. Singleton's affidavit concluded with a statement that Family Services had received notice from Homebuilders that as of February 3, 2021, J.J. had missed fifteen sessions and only attended four. Receipt of this notice presumably triggered the filing of DCFS's request for an instanter safety plan order the following day, February 4, 2021. DCFS's request was considered at a hearing on February 8, 2021, and the safety plan was ordered.

---

[5] Though not explained in the record, it would appear that FFTCW and Homebuilders are treatment-based programs that offer services to family members suffering from drug addiction and related problems in CINC cases. See **State in Int. of E.A.D.**, 2018-465 (La.App. 3 Cir. 12/19/18), 2018 WL 6715186, writ denied, 2019-43 (La. 2/18/19), 263 So.3d 1145.

3

On February 24, 2021, DCFS filed a petition seeking to have C.J. and Je.F. adjudicated as children in need of care (CINC). The matter came for hearing before the 17th Judicial District Court (17th JDC), Division E,[6] on May 4, 2021. J.J. entered a general denial to the allegations in the petition. DCFS moved for a drug screen, and the trial court granted the motion. The drug screen was positive for THC and benzodiazepines. The trial court ordered J.J. to report to drug court for a family preservation court assessment.

The adjudication and family preservation court review came for hearing before the 17th JDC, Division B, on May 27, 2021. Regarding the adjudication, J.J. stipulated that C.J. and Je.F. were in need of care without admitting the allegations of the petition, and the children were adjudicated as CINC as to J.J. With respect to the family preservation court review, the trial court ordered that J.J. be accepted into the family preservation court program.

The record reflects that, as with the Family Services programs, J.J. alternated between compliance and non-compliance with the family preservation court program. A June 17, 2021 minute entry reflects that J.J. was in compliance. However, a July 22, 2021 minute entry reflects that J.J. was not in compliance because she missed multiple drug screens; thus, the trial court advised J.J. that she would be going to inpatient treatment and sanctioned her to 72 hours of community service work due by August 19, 2021. The following minute entry, dated September 30, 2021, reflects that J.J. was again in compliance with family preservation court.

Pertinent to the issues before us on appeal, J.J. gave birth to her third child, Jh.F., on November 13, 2021. Like Je.F., Jh.F. tested positive for benzodiazepines at birth.

A November 18, 2021 minute entry notes that family preservation court was continued to December 6, 2021. The next minute entry, dated December 3, 2021, reflects that J.J. was present before the trial court for contempt and that a previously

---

[6] Pursuant to District Court Rules 3.1 and Appendix 3.1, the 17th JDC is comprised of five divisions, designated as Divisions A, B, C, D, and E. Though not otherwise designated by the Rules or explained in the record, it would appear that these proceedings were originally allotted to Division E, but at times were re-allotted to Division B, which administered and/or functioned as a drug court or a "Disposition & Family Preservation Court."

issued bench warrant was recalled and vacated. The record does not reflect what occurred in the interim to result in the contempt and bench warrant.

A December 6, 2021 minute entry reflects that J.J. was not in compliance because she was not cooperating with the family preservation court program. The trial court sanctioned her to perform 48 hours of community service work by January 21, 2022, and ordered her to produce a urine sample that day.

During a hearing on January 21, 2022,[7] the trial court asked J.J. whether she had satisfied the community service order. J.J. stated that she had. The trial court then stated:

> Ms. Johnson, my notes indicate that you've been inconsistent with compliance in the program. Missed group [December 10, 2021], [December 20, 2021], and January [3, 2022]. You're not attempting to make up any of the groups that you missed. We were here last time you indicated that you would - you would do more, that you'd do better. I don't see it. You didn't attend the graduation like we've been talking about. You're inconsistent with calling the line for testing, and you missed testing on several occasions. You did your community service work, I assume. I didn't look at it. You told me that you did so I'm going to take you at your word.
>
> But because of your continued refusal to maintain compliance, treatment has asked that you be removed from the program, and I'm going to remove you from the program. So you're not going to be in Family Preservation Court anymore. Note also - let me see something. While you're in the program, too, you had a second drug affected newborn, which was, kind of, one of the main things we were trying to avoid.

Thus, the trial court removed J.J. from the family preservation court program, re-allotted the matter back to Division E, and set the disposition hearing for February 2, 2022.

The disposition hearing was held on February 2, 2022. J.J. testified on her own behalf. During J.J.'s testimony, she expressed that she felt she could provide a safe and stable home for her children, that she had a support system from the fathers of the children and her parents, and that she would comply with any requests from DCFS if her children were not removed. When questioned regarding her failure to comply with family preservation court, J.J. alternated between denying that she failed to comply as

---

[7] The transcript of the January 21, 2022 hearing was not originally included in the record on appeal. However, on July 12, 2022, DCFS filed a motion for leave to supplement the record with the January 21, 2022 transcript. This Court granted the motion in an order dated July 27, 2022.

alleged and blaming her noncompliance on difficulty obtaining transportation. Specifically, J.J. stated, "there's no excuse for that except that I don't have transportation"; "When I moved to Raceland, I didn't have transportation. Then I ended up getting my own place for me and my kids. Still didn't have transportation. It just was really hard to try to comply with it, so"; "I would call the line but they would say I wouldn't call the line, which is why I have screen shots of when I would call the line"; "They were telling me that I had positive drug screens when I know I didn't have positive drug screens"; "It just was stuff that was happening that I didn't – I was beginning to not trust the program"; "And I have three kids, like, it's just – it was just too much on me."

With respect to substance abuse, J.J. testified that she had completed START and other programs, but did not complete the inpatient treatment ordered by the trial court on July 22, 2021. In explanation, she stated, "There was something about them wanting me to give them my food stamps for my kids to help bulk feed the facility and I just didn't feel like I had to take food out of my kids['] mouth[s] to help bulk feed the facility, so that's why[.]" J.J. did not receive any further substance abuse treatment after leaving the inpatient facility and was not involved in any type of substance abuse treatment at the time of the hearing. However, she testified that moving to Morgan City in December of 2021 had been very beneficial to her maintaining her sobriety, as it helped her with "getting [away] from around old habits." Claiming that she no longer used or abused drugs, J.J. testified:

> I can pass a drug screen and everything . . . I don't use. I don't think about using anymore. I mean, ever since I came from [inpatient treatment], to be honest, no [m]arijuana use. The only falling I had was, like I said, when I took the Klonopin the day before I had [Jh.F.], but I have not had any other positive drug screens.

Regarding Jh.F.'s positive drug test at birth, which occurred after J.J. left inpatient treatment, J.J. stated:

> When I had [Jh.F.], he was positive for Klonopin. I had ended up taking a Klonopin, like, a day or so before I had [Jh.F.], but it wasn't for, like – it just was me taking a Klonopin because I thought it was something for muscles, but I didn't pay [any] attention to it and I know... you're not supposed to take anything else but Tylenol when you're pregnant.

6

Leteya Scott, a DCFS Supervisor and the case worker assigned to C.J. and Je.F. when J.J. entered the family preservation court program in May of 2021, testified on behalf of DCFS. Though J.J. did not test positive for benzodiazepines during the time she worked with Ms. Scott, Jh.F. was born in November of 2021, and he tested positive for benzodiazepines at birth. Ms. Scott testified that to her knowledge, J.J. was not prescribed benzodiazepines at any time during the case. Ms. Scott confirmed that J.J. participated in an inpatient program for "[m]aybe two or three weeks," but did not successfully complete the program. However, Ms. Scott also confirmed that J.J. tested negative at drug screenings on December 3, 2021, December 15, 2021, and January 11, 2022.

When asked specifically whether there were safety concerns in J.J.'s home in Morgan City, Ms. Scott answered, "[n]o"; when asked whether the children were "in any immediate danger to the agency's standards," Ms. Scott answered, "[t]o the agency's standards, no." Counsel for J.J. asked Ms. Scott whether she had an opportunity to witness J.J. care for her children. Ms. Scott replied:

Yes. I have no concerns about her care for her children. [J.J.] is always appropriate. Her kids have the things that they need. She's familiar with the services like WIC and SNAP and stuff like that. I have no concerns, the agency has no concerns in that regard . . . for their immediate safety.

Ms. Scott further stated that J.J. and her children "[a]bsolutely" seemed loving and bonded. Ms. Scott denied that J.J.'s actions had done anything to cause her concern.

When asked why J.J. was no longer involved in the family preservation court program, Ms. Scott explained that the family preservation court program found that J.J. exhibited "no compliance or little to no compliance, a lot of inconsistencies." She elaborated, "She would call the line. She wouldn't call the line or she'll call the line and she'd not go and test. They just felt like she was not a good fit for the program." When further questioned as to why J.J.'s case plan was not modified after her dismissal from the family preservation court program, Ms. Scott explained that DCFS was waiting

7

to see what action the trial court may take. Ms. Scott testified that J.J.'s SDM[8] rating was "very high" because of "the drug exposed newborn," but DCFS did not request removal of the children because J.J. was "in the most intense program we had to offer, [and] removal wasn't . . . an option."[9] The following colloquy occurred:

> [Counsel for DCFS:] Okay. And now that she's no longer in that program does the case need to be restaffed?
>
> [Ms. Scott:] No. I mean, I think the recommendation has been decided that removal is necessary.
>
> [Counsel for DCFS:] Okay. All right. So at this time the state is requesting removal of all three children?
>
> [Ms. Scott:] Yes.

Counsel for J.J. asked Ms. Scott to articulate the reasonable efforts DCFS had taken "since the last court appearance" to keep the children out of custody. Ms. Scott stated that DCFS had not done anything, other than ask J.J. to take drug screens, in between her last appearance in family preservation court in January and the hearing date. The trial court clarified that this inaction on DCFS's part "would be normal, right?" Ms. Scott confirmed that was correct:

> [The Court:] Once a person goes to family preservation court, the agency would take no independent actions?
>
> [Ms. Scott:] No. The case plan then becomes you need to be compliant with family preservation.
>
> [The Court:] So Counsel is asking you if you've done anything extra extraordinary (*sic*) or beyond the normal scope.
>
> [Ms. Scott:] No.
>
> [Counsel for J.J.:] I'm asking about services that have been referred since.
>
> [The Court:] Family preservation court. But you're asking her if they provided something beyond that which is not their normal policy . . . once the case is transferred to [family preservation court, DCFS] no longer takes independent action. That is the program. She's referred to family preservation court until she got herself kicked out.

Counsel for J.J. then expressed her understanding that "in connection with this disposition hearing they would normally do a staffing and come up with a case plan and

---

[8] SDM stands for Structured Decision Making. The SDM system is a comprehensive case management system used by child protective services which facilitates risk assessments to reduce the incidence of subsequent harm to children and to facilitate timely and expeditious achievement of permanency, including reunification when safe to do so. **State in Int. of R.V.**, 2015-0267 (La.App. 3 Cir. 5/27/15), 165 So.3d 416, 419, citing the Children's Research Center, a division of the National Council on Crime and Delinquency.

[9] A different DCFS employee, Lashaun Miller, was assigned as the investigator for Jh.F.

have a recommendation for the Court, for the Court to consider at disposition." Ms. Scott explained that J.J.'s case was more complex than most, because she had completed the other available services, such as START Corporation, behavioral health, and functional family therapy, prior to entering family preservation court. Moreover, J.J. continued to have positive drug screens after completing the other programs. Thus, there was nothing remaining for DCFS to refer J.J. to do.

After hearing the evidence adduced, the trial court ordered the immediate removal of all three children, and specifically stated that as to Jh.F., the order was an instanter order for removal, for the following reasons orally given:

> Ma'am, listen. I've heard your testimony and you indicated that you left the drug rehab because they wanted to do something you weren't comfortable with. You left the family preservation court because you lost trust in them. You have testified in a manner that is very consistent, after four years in drug court, with every addict I ever dealt with. Everything is someone else's fault, you didn't have transportation, you moved from Houma, to Thibodaux, to Raceland, to Morgan City. You talk about trying to stabilize and, you know, organize your life, and, you know, as your attorney lead you down a path to stating that this was for your sobriety, but you move on such a constant basis. There's nothing in your testimony that in anyway would make me believe there has been any drastic change.

> To the contrary, [Je.F.] and [Jh.F.] were apparently born within a year of each other and both of them tested positive for drugs. That's not a coincidence. That's a habit, a drug habit. In one year two children were born positive. [C.J.], who knows? No one tested [C.J.]. [C.J.] was not tested for drugs. You sound like somebody that could do the program if you chose to, but right now you're not. You're not even making a slight attempt. Everything is somebody else's fault. The program wants to use your ability to obtain aid through the state to feed your children, that wasn't good for you. You felt that the [F]amily [P]reservation [C]ourt, who has helped scores of families, was intentionally being deceitful by giving you false positives.

> This Court has no alternative. I'm going to order the immediate removal of all three children, order [DCFS] to take custody.

> Ma'am, at that time you will be given the opportunity to work a program. You're going to have to stabilize your lifestyle because you can't move every six weeks. You can't try and jump jurisdictions, because that's what you're doing. You went from Houma. You didn't like it. You came to Lafourche. You didn't like it. Now you're going to try St. Mary. That's not going to work. Also, if there's going to be a gentleman living with you, father or not, he's going to be involved in the program. He's going to be drug screened, he's going to be tested, and he's going to be required to perform in the family services... And for [Jh.F] this is an instanter order for removal.

A written judgment of disposition as to C.J. and Je.F. was executed on February 8, 2022. The judgment of disposition placed C.J. and Je.F. in the custody of DCFS, with

a case plan goal of reunification concurrent with adoption. The judgment of disposition further specified the trial court's finding that the disposition was the "least restrictive, consistent with the circumstances of the case, the health and safety of the child(ren), and the best interest of society." The judgment of disposition also explicitly found that DCFS made reasonable efforts to prevent or eliminate the need for removal of C.J. and Je.F. It is from this judgment that J.J. appealed.[10]

## STANDARD OF REVIEW

In cases involving the custody of children, the trial court is vested with a vast amount of discretion. The trial court is in a better position to evaluate the best interest of a child because of its superior opportunity to observe the parties and the witnesses who testified at the trial. As an appellate court, we must afford great deference to the trial court's decision, not only because of that court's better capacity to evaluate witnesses, but also because of the proper allocation of trial and appellate functions between the respective courts. **State ex rel. AR**, 99-0813 (La.App. 1 Cir. 9/24/99), 754 So.2d 1073, 1077, 1080. Thus, it is well-settled that an appellate court cannot set aside a juvenile court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. **In re A.J.F.**, 2000-0948 (La. 6/30/00), 764 So.2d 47, 61.

In reviewing a juvenile matter for manifest error, it is important that the appellate court not substitute its own opinion when it is the trial court that is in the unique position to see and hear the witnesses as they testify. **State in the Interest of J.C. and J.C.**, 2016-0138 (La.App. 1 Cir. 6/3/16), 196 So.3d 102, 107. When a fact

---

[10] We note that this Court has appellate jurisdiction over all matters appealed from juvenile courts. LSA–Const. art. V, § 10(A)(2). Louisiana Children's Code article 330 specifies the rulings that may be appealed:

> A. An appeal may be taken from any final judgment of a court and shall be to the appropriate court of appeal.

> B. In delinquency proceedings pursuant to Title VIII, child in need of care proceedings pursuant to Title VI, and families in need of services proceedings pursuant to Title VII, an appeal may be taken only after judgment of disposition. The appeal shall include all errors assigned concerning the adjudication and disposition.

Pursuant to this article, an appeal may be taken only after a judgment of disposition. While the trial court executed a judgment of disposition as to C.J. and Je.F., the trial court did not execute a judgment of disposition as to Jh.F. However, when an unrestricted appeal is taken of a final judgment determinative of the merits, the appellant is generally entitled to seek review of all adverse interlocutory judgments prejudicial to him, in addition to the review of the final judgment. **Judson v. Davis**, 2011-0623 (La.App. 1 Cir. 11/9/11), 81 So.3d 712, 724, <u>writ denied</u>, 2011-2747 (La. 2/17/12), 82 So.3d 288. Thus, we may consider the oral instanter order of removal as to Jh.F. as an adverse interlocutory judgment.

finder is presented with two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. **Babcock v. Martin**, 2019-0326 (La.App. 1 Cir. 10/24/19), 289 So.3d 606, 612. Thus, where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the trial court. Consequently, if the trial court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. **State in the Interest of J.C.**, 196 So.3d at 107.

## LAW AND DISCUSSION

First Assignment of Error: The Removal of C.J. and Je.F.

J.J.'s first assignment of error challenges the removal of her children C.J. and Je.F., who were previously adjudicated as CINC, from her custody.

Once a trial court has adjudicated a child in need of care, it may place the child in the custody of a parent or such other suitable person on such terms and conditions as deemed in the best interest of the child or in the custody of a private or public institution or agency. LSA-Ch.C. art. 681. Pursuant to LSA-Ch.C. art. 682, the court shall not remove a child from the custody of his parents unless his welfare cannot be adequately safeguarded without such removal. **State in the Interest of A.R.**, 99-0813 (La.App. 1 Cir. 9/24/99), 754 So.2d 1073. Further, when a child is removed from the custody of his parents, the Department must demonstrate that "reasonable efforts" have been made to "prevent or eliminate" the need for that removal, and, after a child has been removed from the custody of his parents, the Department must demonstrate that it has made "reasonable efforts" to "reunify" the parent and the child. LSA-Ch.C. art. 682(A); **State, ex rel. D.T.**, 2008-2231 (La.App. 1 Cir. 5/15/09), 17 So.3d 31, 39. In removing a child from his parents, the considerations set forth in LSA-Ch.C. art. 682 are obligatory. **State in the Interest of A.M.**, 2011-2378 (La.App. 1 Cir. 3/23/12), 2012 WL 996563, *6 (unpublished).

11

On appeal, J.J. argues that the trial court erroneously removed C.J. and Je.F. from her custody because DCFS failed to prove that the children were in danger while in her care, that removal was necessary for their safety, and that DCFS made reasonable efforts to prevent removal. Consistent therewith, in a brief submitted in support of J.J.'s appeal, counsel for C.J. and Je.F. argues that their removal violated LSA-Ch.C. art. 682 because Ms. Scott, the DCFS caseworker, offered testimony that there were no concerns for the children's safety while in J.J.'s care. In opposition, DCFS maintains that the requirements of LSA-Ch.C. art. 682 were satisfied and the removal was proper in light of J.J.'s repeated drug abuse and failure to comply with the programs she was referred to.

We begin by addressing J.J.'s argument that DCFS failed to show it made reasonable efforts to prevent or eliminate the removal as required by LSA-Ch.C. art. 682. "Reasonable efforts" comprehend the exercise of ordinary diligence and care by state caseworkers and supervisors and shall assume the availability of a reasonable program of services to children and their families. LSA-Ch.C. art. 603(25). In order to constitute "reasonable efforts," the Department must at least direct parents toward appropriate agencies that may be able to assist them in meeting their responsibilities with respect to their dependent children and/or in removing the impediments to reunification with their children. **State, ex rel. D.T.**, 17 So.3d at 39. In this matter, it is plainly evident from the record, which details the extensive history of J.J.'s admission to and noncompliance with numerous programs, that reasonable programs of services were available to J.J. and that DCFS undertook reasonable efforts to direct and assist J.J. in obtaining aid from the agencies, programs, and services available to assist her. Thus, the trial court did not err in finding that DCFS made reasonable efforts to prevent or eliminate the need for removal regarding C.J. and Je.F.

We next consider J.J.'s argument that the trial court erroneously removed C.J. and Je.F. from her custody because DCFS failed to prove that the children were in danger while in her care and that removal was necessary for their safety.[11]

In this matter, over the course of nearly two years, J.J. was given numerous opportunities to "get her life in order." She did not. Instead, she demonstrated a pattern of non-compliance with the programs offered to her, as well as an inability to maintain her sobriety. While Ms. Scott testified that she has observed J.J. providing appropriate care for her children, Ms. Scott also testified regarding J.J.'s consistent non-compliance with the programs and assistance offered to her, and regarding the birth of J.J.'s second drug-affected newborn. Moreover, the record is replete with evidence of J.J.'s continued substance abuse. As set forth above, it is well-settled that an appellate court cannot set aside a juvenile court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. **In re A.J.F.**, 764 So.2d at 61. Consequently, if the trial court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. **State in Interest of J.C.**, 196 So.3d at 107. Considering the record before us, we cannot say that the trial court manifestly erred in its opinion that the welfare of C.J. and Je.F. could not be adequately safeguarded without removal from their mother's custody.

Second Assignment of Error: The Removal of Jh.F.

In J.J.'s second assignment of error, she argues that the trial court erred in removing Jh.F. from her custody because DCFS had not requested custody through the procedures set forth in Chapter 6, Title 6 of the Children's Code. J.J. maintains that an oral instanter order is only permitted under LSA-Ch.C. art. 620 in "exceptional circumstances," which did not exist in this matter. C.J. and Je.F. also argue that the trial court acted outside the scope of its authority in ordering removal of Jh.F. during a

---

[11] Regarding the cases relied on by the parties on appeal, we note at the outset of this discussion that the procedural posture of this matter is significantly distinguishable: in **State in the Interest of D.A.**, 2014-0517 (La.App. 3 Cir. 10/1/14), 2014 WL 4926250 (unpublished), the mother appealed from a judgment of adjudication; in **State in the Interest of J.C. and J.C.**, 2016-0138 (La.App. 1 Cir. 6/3/16), 196 So.3d 102, the State appealed from a judgment declining to adjudicate the children as CINC; and in both **State in the Interest of J.C. and J.S.**, 50,550 (La.App. 2 Cir. 12/16/15), 184 So.3d 805, and in **State in the Interest of B.J.**, 48,857 (La.App. 2 Cir. 1/15/14), 135 So.3d 777, the mother appealed from a judgment terminating parental rights.

disposition hearing as to his older siblings, because DCFS had not requested custody through the proper procedures set forth in LSA-Ch.C. art. 619. In opposition, DCFS maintains that exceptional circumstances warranted the oral instanter order for removal of Jh.F.

Chapter 6, Title 6 of the Children's Code provides for procedures for the protection of a child either before or after a formal child in need of care petition is filed.[12] See LSA-Ch.C. arts. 617-627; **In re J.D.**, 2015-1585 (La.App. 1 Cir. 5/10/16), 195 So.3d 518, 520. Louisiana Children's Code article 619(A) permits DCFS to file a verified complaint alleging facts showing that there are reasonable grounds to believe that the child is in need of care and that emergency removal is necessary to secure the child's protection. Upon presentation of the verified complaint, the trial court shall immediately determine whether emergency removal is necessary to secure the child's protection. LSA-Ch.C. art. 619(C)(1); **In re J.D.**, 195 So.3d at 520. If the court determines that the child's welfare cannot be safeguarded without removal, the court shall immediately issue a written instanter order directing that the child be placed in the provisional custody of a suitable relative or other suitable individual capable of protecting the health and safety of the child or be taken into the custody of the state. LSA-Ch.C. art. 619(C)(2); **In re J.D.**, 195 So.3d at 520. The written order must also contain written findings of fact supporting the necessity of the removal. LSA-Ch.C. art. 619(C)(2).

In exceptional circumstances, pursuant to LSA-Ch.C. art. 620(A), the facts supporting the issuance of an instanter order and the exceptional circumstances may be relayed orally to the judge and the order directing that a child be taken into custody may be issued orally. **In re J.D.**, 195 So.3d at 520. In such cases, LSA-Ch.C. art. 620(B) provides that an affidavit containing the information previously relayed orally "shall be filed with the clerk of the court within twenty-four hours and a written order shall be issued." Further, the written order "shall include the court's findings of fact

---

[12] We note that since the date of the hearing and judgment at issue in this appeal, numerous provisions of the Children's Code were amended by 2022 La. Act 272, approved June 3, 2022. However, the changes do not substantively affect our analysis.

14

supporting the necessity for the child's removal." LSA-Ch.C. art. 620(B); **In re J.D.**, 195 So.3d at 521.

In this matter, the evidence presented at the hearing may well support the trial court's finding of exceptional circumstances warranting the issuance of an oral instanter order of removal as to Jh.F. However, the language employed in LSA-Ch.C. art. 620(B) states that an affidavit "shall" be filed and a written order "shall" be issued. The word "shall" is mandatory. See LSA-C.C.P. art. 5053. Thus, the procedural mandates of LSA-Ch.C. art. 620(B) were not satisfied. Moreover, we are unable to find an alternative basis on which to uphold the removal of Jh.F. under LSA-Ch.C. art. 619, as no verified complaint was filed as to Jh.F. and no written instanter was issued as required by LSA-Ch.C. art. 619. And, although the facts supporting the removal of Jh.F. were adduced at the evidentiary hearing prior to the judgment of disposition ordering the removal of C.J. and Je.F., Jh.F. was not a named party to those proceedings, nor was he named in the judgment of disposition. The transcript of the February 2, 2022 hearing reflects that after the trial court granted the oral instanter order, the State expressed an intent to "file a new petition on [Jh.F.]"; however, any such proceeding is not a part of the record before us. Accordingly, we are constrained to vacate the oral instanter order of removal issued as to Jh.F.

## CONCLUSION

For the foregoing reasons, the February 2, 2022 oral instanter order of removal regarding Jh.F. is vacated. The February 8, 2022 written judgment of disposition including the order of removal regarding C.J. and Je.F. is affirmed. Costs of the appeal are assessed fifty per cent to J.J., in the amount of $480.50; twenty-five per cent to the Department of Children and Family Services, in the amount of $240.25; and twenty-five per cent to the District Attorney's Office, in the amount of $240.25.

**VACATED IN PART AND AFFIRMED IN PART.**

15

| STATE OF LOUISIANA | STATE OF LOUISIANA |
|---|---|
| IN THE INTEREST OF | COURT OF APPEAL |
| C.R.J. AND J.F. | FIRST CIRCUIT |
| | 2022 CA 0544 |



**HOLDRIDGE, J., respectfully concurs in part.**

I respectfully agree in part and concur in part. I agree with that part of the opinion affirming the order of removal as to C.J. and Je.F. in docket number J-14564. However, I concur with that part of the opinion vacating the oral instanter order of removal of Jh.F. I know of no legal basis for this court to vacate an interlocutory ruling of a trial court from a different case (J-14872) that is not on appeal nor part of the case that is presently before this court on appeal (J-14564). However, I am confident that the trial court has by this date issued a valid custody determination as to Jh.F. in docket number J-14872 in accordance with the Children's Code. Therefore, I concur with vacating the instanter order because this issue is probably moot.