# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

## 2025 CJ 0257

## STATE OF LOUISIANA
## IN THE INTEREST OF C.W.

*Judgment Rendered:* SEP 1 9 2025

\*\*\*\*\*\*\*\*

23rd Judicial District Court
In and for the Parish of Ascension
State of Louisiana
Case No. J-21176

The Honorable Thomas J. Kliebert, Jr., Judge Presiding

\*\*\*\*\*\*\*\*

Jane Hogan
CINC Appellate Project
Hammond, Louisiana

Counsel for Appellant
K.W., Mother

Benjamin McDonald
Bureau of General Counsel
Gonzales, Louisiana

Counsel for Appellee
State of Louisiana, Department of
Children and Family Services

Mary R. Mustaller McMillan
Southeast Louisiana Legal Services
Children's Legal Services Project
New Orleans, Louisiana

Counsel for
C.W., Minor Child

\*\*\*\*\*\*\*\*

BEFORE: LANIER, WOLFE, AND HESTER, JJ.

**LANIER, J.**

The mother appeals a judgment terminating her parental rights and certifying her child for adoption. We find that the State of Louisiana, Department of Children and Family Services ("the State"), has carried its burden of proof to terminate the mother's parental rights and free the child for adoption. For the reasons discussed below, we affirm the district court's judgment.

## FACTS AND PROCEDURAL HISTORY

K.W. and E.C. are the biological parents of C.W., born on December 20, 2020.[1] The parents both have a history with the State based on extensive substance abuse and mental health issues.[2] On December 30, 2020, the State received a report with allegations of neglect/drug affected newborn against K.W. as a result of C.W.'s meconium testing positive for marijuana. The State took C.W. into custody on February 18, 2021, by instanter order, placing the child in the care of her paternal grandmother. Following a 72-hour continued custody hearing, the district court found reasonable grounds existed to find C.W. was in need of care and ordered that she remain in the custody of the State pending further proceedings.

Thereafter, the State filed a petition seeking adjudication of C.W. as a child in need of care, alleging that the child's best interest would be served by maintaining custody with the State.

After being continued at the request of K.W.'s counsel, the adjudication hearing was set for May 17, 2021. Prior to the adjudication hearing, the State submitted a May 11, 2021 report to the district court. Attached to this report was a

---

[1] In order to protect the identity of the minor child in this confidential proceeding, we refer to the child and the parties by their initials. See Uniform Rules-Courts of Appeal, Rule 5-2.

[2] Although he was not listed on C.W.'s birth certificate, E.C. voluntarily surrendered his parental rights to C.W. on May 3, 2024. Thus, our discussion herein only concerns the State's case as it relates to K.W.

police report dated March 21, 2021, indicating that K.W. had been accused of stealing the title to a car and making fraudulent charges on another person's credit card. When asked by the investigating officer for a current address, K.W. stated that "she was currently homeless and moving from house to house with friends." Thereafter, on May 17, 2021, the district court adjudicated C.W. as being in need of care pursuant to a stipulation by the parents without admissions to the supporting allegations.

At a June 21, 2021 disposition hearing, the district court noted the animosity between the parties and the effects on "anything regarding possible reunification or even being able to facilitate visits with the child." The district court changed the case plan from the prior family placement with the child's paternal grandmother to confidential placement in foster care with visits through the State. The district court added, "[n]o family placement. Let's get a disinterested third-party foster to take care of the child for right now so you guys can continue working your case plan."

On August 16, 2021, the matter was set for a review hearing. At that time, it was reported by the State that K.W. had not made any parental contributions to the State but was providing clothes and other things for C.W. K.W. did not have stable housing and had not completed a mental health evaluation, but she was participating in a substance abuse program, random drug screens, and parenting classes. The district court agreed with the State's recommendation to keep C.W. in foster care with the State, "with the current case plan of reunification, concurrent goal of adoption."

In January 2022, the State had reports of K.W. being fired from a job that she had only recently begun. K.W. was allegedly fired for disappearing during her shifts and inquiring about buying drugs while at work. In a February 11, 2022 letter to the district court, the State noted that K.W. shows no protective capacities, has an extensive history of substance abuse and mental health issues, struggles to maintain

3

her sobriety, and lacks finances. The State expressed concerns about K.W.'s ability to protect and properly meet C.W.'s basic needs. As a result, the State recommended that the permanency goal be changed to adoption.

At a June 20, 2022 permanency hearing, the district court found a continuing necessity to continue C.W. in the State's custody with the case plan goal of reunification. The district court further concluded that although the State had made reasonable efforts to prevent the removal of the child and make it possible for the child to return home, there had been inadequate progress by K.W. toward alleviating or mitigating the causes necessitating the child's placement in foster care.

In an October 2022 letter to the district court, the State reported that K.W. had six positive drug screens from April 2021 through May 2022 and had not been consistent with her substance abuse or mental health treatment. K.W. was also unable to maintain stable employment. In November 2022, the State recommended that the case plan be changed to adoption, and the district court agreed.

At an initial permanency hearing in February 2023, there was some confusion about K.W.'s drug screens, specifically, a urine screen that had come back positive for cocaine. K.W. stated that she was "detoxing" her system with teas, but was not under the influence of anything else, not even her prescribed medications. She added that she had been working the case plan for two years and expressed a willingness to submit to more frequent drug screens. Prior to this hearing, K.W. had tested positive on several different occasions for methamphetamines, amphetamines, and marijuana. While K.W. indicated that one of her positive drug screens was due to her taking promethazine for nausea, there is nothing in the record to explain the other positive screens other than K.W.'s acknowledgment that she is a "chronic user of THC." The district court agreed to change the case plan goal to reunification concurrent with adoption to allow K.W. to continue to work the case plan and get things sorted out with the drug screens.

4

At the May 2023 review hearing, the same issues regarding K.W.'s drug screen were addressed. The district court ordered K.W. to submit to a hair follicle drug test within 24 hours of the hearing and submit the results to all parties. According to the record, K.W. failed to submit to this court-ordered drug screen and failed to attend the family visit with C.W. that was scheduled with K.W. during the hearing.

At an August 2023 review hearing, the State reported that K.W.'s most recent drug test was negative. She had not been consistent with her visits with C.W. but had made the last two scheduled visits. With regard to parental contributions, K.W. was bringing food to the visits, but had not made any payments towards C.W.'s support. The district court maintained the case plan goal as reunification concurrent with adoption. Subsequently, in October 2023, noting that C.W. had been in the State's custody since February 18, 2021, the district court adopted the State's recommended case plan of adoption for C.W.[3] At a May 2024 status hearing, the district court ordered that K.W. submit to drug testing a minimum of once a month.

Thereafter, on May 20, 2024, the State filed a petition for the termination of parental rights of K.W., contending that termination of her parental rights was in the best interest of C.W. and requesting termination under La. Ch. Code art. 1015(4)(b) and (5). Trial was held on July 15, 2024. K.W., caseworker Amanda Armant, and K.W.'s mother, R.G., testified at trial. At the conclusion of the trial, the district court found it was in the best interests of C.W. that K.W.'s parental rights be terminated under La. Ch. Code art. 1015(4)(b) and (5). On July 29, 2024, the district court signed a judgment terminating the parental rights of K.W. and freeing C.W. for adoption. It is from this judgment that K.W. has appealed.

---

[3] We note that K.W. appeared by Zoom at both the August 2023 hearing and the October 2023 hearing. According to the record, K.W. was arrested on August 17, 2023, on several charges including possession of a schedule II CDS. She remained incarcerated until December 2023.

# DISCUSSION

On appeal, K.W. contends that the district court "abandoned its role as a neutral arbiter, which is a structural error that requires reversal." K.W. further argues that the district court erred in terminating her parental rights because: (1) the State failed to prove that K.W. had not substantially complied with her case plan; (2) the State failed to prove that K.W.'s failure to pay monetary contributions was the result of willful dereliction of parental duties rather than the result of a financial inability to pay; and (3) the district court's comments on guardianship prove that termination of K.W.'s parental rights was not in the best interest of C.W.

## *Ad hoc Judge's Conduct at Trial*

Before addressing the district court's ruling terminating K.W.'s parental rights, we must first consider K.W.'s argument that the recently appointed *ad hoc* judge[4] assigned to her termination hearing abandoned its role as a neutral arbiter. K.W. alleges the judge "far exceeded its power to ask clarifying questions from the bench and instead injected commentary, rendered its own objections to evidence, and told counsel for [the State] to lodge objections." In support of her argument, K.W. points to several interactions between her and the judge and other instances of what she asserts was the judge giving the State "advice" on how to present its case. K.W. maintains that the judge demonstrated a clear bias against her, becoming an advocate for the State. We find no merit to K.W.'s argument.

Pursuant to La. Code Civ. P. art. 1631, "[t]he court has the power to require that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at trial, so that justice is done." La. Code Civ. P. art. 1631(A). Moreover, the district court may question a witness, whether called by itself or by the parties. La. Code Evid. art. 614(B). In a bench

---

[4] The same judge presided over this matter from the initial court hearing on February 24, 2021, until the *ad hoc* judge was appointed in February 2024.

6

trial such as in this case, "the dangers inherent in questions from the bench are greatly mitigated because there is no jury to confuse or mislead." **Williams v. Western Preferred Cas. Ins. Co.**, 465 So.2d 191, 194 (La. App. 3 Cir. 1985). However, Comments-1988, comment (c) to Article 614 states that "[t]he power of the court to question witnesses, moreover, does not authorize a court to exercise that power in the same manner as adversary counsel." In other words, the trial judge, while asking a witness questions from the bench, must remain impartial and must not become an "advocate" for one side or the other. **Midyett v. Midyett**, 32,208 (La. App. 2 Cir. 9/22/99), 744 So.2d 669, 675.

Although the *ad hoc* judge was very involved in the termination hearing below, we cannot say the judge abused his discretion in any way. Having reviewed the entire record and as is discussed more fully below, the record supports the ultimate factual conclusion reached by the judge in considering the State's petition to terminate K.W.'s parental rights. We discern no impartiality by the judge in reaching its decision to terminate K.W.'s parental rights and free C.W. for adoption.

*Standard of Review/Termination of Parental Rights*

Termination of the legal relationship between natural parents and children is one of the most drastic actions the State can take against its citizens. **State in Interest of A.L.D.**, 2018-1271 (La. 1/30/19), 263 So.3d 860, 863. The interests of the parents and children must be balanced; however, the paramount consideration is the best interest of the children. **State in Interest of C.F.**, 2017-1054 (La. 12/6/17), 235 So.3d 1066, 1075. Thus, rather than simply protecting parental rights, our judicial system must protect the rights of children to thrive and survive in a safe, secure environment and to be reared by someone capable of caring for them. *Id.* To protect children whose parents are unwilling or unable to provide safety and care adequate to meet their physical, emotional, and mental health needs, the Louisiana

7

Children's Code provides a judicial process for terminating the parents' rights and responsibilities and certifying children for adoption. La. Ch. Code art. 1001.

Louisiana Children's Code article 1015 enumerates the grounds for the involuntary termination of parental rights. The State must prove the elements of at least one of the statutory grounds for termination by clear and convincing evidence. **State in Interest of T.L.**, 2021-0728 (La. App. 1 Cir. 12/22/21), 340 So.3d 4, 8, writ denied, 2022-00170 (La. 3/2/22), 333 So.3d 827; La. Ch. Code art. 1035(A). That is, the State must prove that the existence of the ground for termination is highly probable or much more probable than its nonexistence—more than proof by a preponderance of the evidence, but less than proof beyond a reasonable doubt. **In re L.M.M., Jr.**, 2017-1988 (La. 6/27/18), 319 So.3d 231, 244 n.13. If the district court finds that the State has met its burden of proving one of the grounds for termination by clear and convincing evidence, the district court must then determine whether termination is in the best interests of the children. See La. Ch. Code art. 1039; **State in the Interest of A.L.D.**, 2018-1271 (La. 1/30/19), 263 So.3d 860, 863.

These factually-intense determinations are reviewed on appeal under a manifest error standard of review. **State in Interest of T.L.**, 340 So.3d at 7-8. A reviewing court must accord great deference to the factual findings of the district court and cannot set aside those findings of fact in the absence of manifest error or unless those findings are clearly wrong. *Id.* at 8.

In the instant case, the district court signed a judgment on July 29, 2024, terminating the parental rights of K.W. and freeing C.W. for adoption, specifically referencing K.W.'s abandonment of her child. Therein, the district court concluded that the State had proven by clear and convincing evidence that K.W. had abandoned C.W. under Article 1015(4)(b), inasmuch as for a period in excess of six consecutive months she failed to provide significant contributions to the child's care and support. The district court further found that the State had proven by clear and convincing

8

evidence that pursuant to Article 1015(5), at least one year had elapsed since C.W. was placed in the State's custody and there had been no substantial compliance with the court-approved case plan by K.W. Louisiana Children's Code article 1015(4)(b) and (5) provides:

> (4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
>
> . . . .
>
> (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.
>
> . . . .
>
> (5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

### Termination of K.W.'s Parental Rights for Failing to Comply with Case Plan

On appeal, K.W. argues that she "substantially" complied with her case plan, noting that she had completed two parenting courses, domestic violence counseling, and "the majority" of a substance abuse program. She further alleges that the district court failed to determine whether the State made reasonable efforts to achieve reunification and whether there was a reasonable expectation of improvement in the near future. We find no merit to K.W.'s arguments.

Under La. Ch. Code art. 1015(5) the State had to prove three elements: 1) it had been one year since C.W. had been removed; 2) K.W. had not substantially complied with the case plan for services; and, 3) there was no reasonable expectation of significant improvement in K.W.'s condition or conduct in the near future. See

**State in the Interest of A.L.D.**, 263 So.3d at 863. Louisiana Children's Code article 1036(C) states that lack of parental compliance with a case plan may be evidenced by one or more of the following:

> (1) The parent's failure to attend court-approved scheduled visitations with the child.
>
> (2) The parent's failure to communicate with the child.
>
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
>
> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
>
> (5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
>
> (6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
>
> (7) The persistence of conditions that led to removal or similar potentially harmful conditions.
>
> (8)(a) The parent's failure to provide a negative test result for all synthetic or other controlled dangerous substances, except for any drug for which the parent has lawfully received a prescription, at the completion of a reasonable case plan.
>
> (b) For purposes of this Article, "controlled dangerous substance" shall have the meaning ascribed in [La.] R.S. 40:961.

Moreover, the lack of any reasonable expectation of significant improvement in the parent's conduct in the near future under La. Ch. Code art. 1015(5) may be evidenced by "substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior." La. Ch. Code art. 1036(D)(1).

No expert opinion was offered in this matter, but the State did provide evidence of an established pattern of behavior. To avoid termination of parental

rights, a parent must show a significant change in the behavior that originally led to the child's removal by the State. See **State in Interest of T.L.**, 340 So.3d at 12.

According to the case plan filed into the record, the State required K.W. to: (1) maintain housing that is physically safe and meets the child's basic needs; (2) contribute payments toward the cost of her child's care in the amount of $25/month; (3) complete/comply with substance abuse and mental health programs assessments and recommendation; (4) secure and maintain legal and stable employment; (5) undergo random drug screens; (6) refrain from the use of illegal substances; (7) make herself available for announced an unannounced home visits; (8) participate in all Family Team Meetings and court hearings, and attend all visits with the child; (9) keep her caseworker informed of her whereabouts as well as any pending criminal charges or any other circumstances that may have an influence or create a barrier in the reunification process; and (10) complete parenting education.

The district court noted in its oral reasons that the case, now in its third year since C.W. was taken into custody, had been continued multiple times with no sense of urgency on the part of anyone involved. The district court found that K.W. was "not complying with a great portion of the case plan," pointing specifically to her failure to complete substance abuse and mental health treatment, her failure to provide a valid prescription for medical marijuana, her failure to maintain stable employment, the many missed visits with C.W., and her failed drug screens.

In a letter dated May 8, 2024, the last letter submitted to the district court before the termination hearing, the State reported its findings with regard to K.W.'s progress with her case plan. At that time, although K.W. reported that she was cleaning houses for cash, the State was still waiting for proof of employment to verify financial means and stability. K.W. was living with her father at that time in Prairieville, Louisiana. K.W. had two positive drug screens for amphetamines, methamphetamines, and marijuana in February 2024, and had not yet completed

substance abuse or mental health treatment. Moreover, while K.W. reported to the State that she was on probation for three years, the State was unable to verify what K.W.'s probation was for because K.W. did not share any further information. Additionally, K.W. had been inconsistent in her visitation with C.W., missing her last two scheduled visits.

K.W. testified at the termination hearing on July 15, 2024. She indicated that although she had five children, none were in her custody.[5] K.W. further acknowledged that there had been "conversation for the last two years on and off" with DCFS about her surrendering her parental rights to C.W. Further, K.W. conceded that she had one counseling session concerning surrendering her rights to C.W. Regarding her use of illicit substances, K.W. testified stated that she had a prescription for medical marijuana for the treatment of borderline depression, severe PTSD, anxiety, and migraines. When asked if she had ever used any other drugs, K.W. stated she had tried cocaine, methamphetamines, and Xanax. She also admitted to being in prison once, and "jail on and off" since she was 17 years old.

Although K.W. had a positive drug screen in February 2024 for methamphetamines and amphetamines, K.W. maintained that she had not used methamphetamines for over two years.[6] When asked if she had any explanation for the positive drug screen, K.W. stated that "the only other thing" she does is "buy CBD carts and stuff from a smoke shop." K.W. also admitted that although she had been enrolled in two different substance abuse classes, she had been discharged from both programs because of her marijuana prescription. Moreover, K.W. noted that

---

[5] According to the record, at the time of these proceedings, K.W.'s mother had sole custody of two of K.W.'s three other children, and K.W.'s third child had been adopted by a family member. Moreover, while the State's case concerning C.W. was pending, K.W. gave birth to her fifth child, A.W., who was also removed from K.W.'s custody and placed under the guardianship of K.W.'s mother.

[6] Although K.W. testified that the positive drug screen was in January 2024, the record reflects that at the time of the termination hearing, her most recent positive drug screen was in February 2024.

while she had been prescribed many "different medications" over the years, she was only using marijuana to treat her depression, anxiety, and PTSD. K.W. further testified that she did not have a current mental health care provider, but that she was in a mental health program until she was incarcerated. She added that she had completed two parenting courses, domestic abuse victims counseling, and, just recently, a mental health assessment.

When asked how many visits she had missed with C.W., K.W. indicated she had "no idea" and could not confirm the State's allegation that she had missed 16 visits. Moreover, K.W. testified that the only reason she ever missed visits with C.W. was due to transportation issues. K.W. indicated that she does not have a vehicle and that she had asked the State for help with getting to the visits with C.W. to no avail.[7] K.W. added that she had last visited with C.W. in June 2024. When asked how often she sees her three children who live with her mother, K.W. replied, "Like every other day. I spend every weekend at their house." K.W. explained that she was living only a few blocks away from her mother's house.

According to the record, from the time C.W. was taken into custody until November 2022, K.W.'s bi-weekly visits with C.W. were relatively consistent and the interactions between them were appropriate. K.W. was observed to be loving and attentive to C.W. In November 2022, when the case plan goal changed to adoption, the visits were changed to monthly. According to a May 11, 2023 report, K.W. had only visited with C.W. once since February 15, 2023. In August 2023, the family visits reverted back to bi-weekly as a result of the case plan goal changing to adoption concurrent with reunification. Nonetheless, it was reported that K.W. had only visited with C.W. on three occasions since February 2023. K.W. missed all of

---

[7] According to the record, a judge in a prior hearing had ordered that the State did not have to assist K.W. with transportation for her visits with C.W. due to a prior incident that occurred while K.W. was in a vehicle driven by a caseworker.

13

her visits with C.W. from August 2023 through December 2023 because she was incarcerated, and, after she was released, K.W. only visited once with C.W. at the beginning of 2024.

Ms. Armant, the State's case worker in this matter, testified at hearings throughout this proceeding and at the termination hearing about the efforts the State made to assist K.W. in achieving all of the requirements of her case plan. Ms. Armant testified that K.W. never completed the bonding assessment as ordered by the district court, never provided verification of employment as requested by DCFS, and missed 16 visits with C.W. within the past year alone.

Ms. Armant further noted that the reason K.W. was unable to complete substance abuse treatment was not her use of medical marijuana. Rather, the issue was that K.W. was not consistent with attendance, had not been to the clinic for three months prior to her incarceration, and was not doing her monthly urine drug screens. Ms. Armant indicated that one of the programs even made a special exception for K.W., allowing her to use medical marijuana while participating in treatment. However, Ms. Armant noted that K.W. was in that program over one year for what was meant to be a 16-week course. Concerning K.W.'s medical marijuana prescription, Ms. Armant stated that although she had requested proof from K.W. of a valid prescription, she had yet to receive a copy of K.W.'s current prescription.[8] Ms. Armant also testified that K.W. admitted that while she was living with E.C., he physically abused her, resulting in a collapsed lung.

According to Ms. Armant, K.W. has had sufficient time to complete her case plan requirements but has been neither compliant nor consistent with the case plan. The State believed it was in C.W.'s best interest that she be freed for adoption so that

---

[8] We note, as did the district court, that the only evidence submitted by K.W. regarding her medical marijuana prescription is a copy of a letter from Trevor Peck, MD, dated July 5, 2024, wherein Dr. Peck indicates that K.W. is his patient and is on a protocol that includes prescription marijuana for the treatment of PTSD, migraines, anxiety, and insomnia.

she can have some permanency in her life. Ms. Armant described a very loving relationship between C.W. and her foster family, especially her foster parent who she calls "mom." To the contrary, Ms. Armant testified that although C.W. is not afraid to be around K.W., Ms. Armant has never heard C.W. refer to K.W. as "mom" and does not believe that there is a bond between K.W. and her child.

K.W.'s mom, R.G., also testified at the termination hearing. She indicated that she has guardianship of three of K.W.'s children (ages fourteen, twelve, and two) and would be willing to accept guardianship of C.W. as well. When asked about K.W.'s relationship with her children, R.G. testified that "they all get along okay in any normal family setting." She noted that the children know that K.W. is their mother and that when K.W. is in the home, she does have some authority there. R.G. stated that K.W. is not allowed to drink or smoke when she is around the children or in R.G.'s home. She further testified that she has left K.W. alone with the children before and has never had any issues.

Regarding K.W.'s medical marijuana usage, R.G. testified that she cannot stand the smell of marijuana and it is not allowed in her home. However, she added that K.W. "can go down the road and smoke it all she wants." R.G. noted that she has never seen K.W. "do any of that" in front of her children. R.G. was "very aware" of the domestic abuse of K.W. by E.C. and did not allow E.C. in her home. R.G. did add, however, that K.W. would be able to protect her children from E.C.

From our review of the record, we cannot say the district court was manifestly erroneous in finding that K.W.'s parental rights should be terminated under La. Ch. Code art. 1015(5). While K.W. may have taken some steps in the right direction, she had the opportunity throughout the duration of her case to show that she was willing and able to care for C.W. and failed to do so. Any progress made by K.W. is negated by the fact that she has consistently refused to put C.W.'s needs ahead of her own.

15

C.W. has been in the State's custody since February 18, 2021, and with her foster family since July 7, 2021, and yet, as the district court noted in oral reasons for judgment, K.W. has not complied with " a great portion of the case plan." K.W. has failed to successfully complete the recommended substance abuse and mental health treatment programs; failed to complete the bonding assessment; failed to provide a valid prescription for her medical marijuana; failed to show proof of stable employment; failed to remain drug free; and failed to attend all scheduled visits with C.W. After over three years of reasonable efforts and services from the State, the record supports a finding that K.W. has not made substantial improvement in rectifying the problems preventing reunification.

When a child is removed from the custody of her parents, the State must demonstrate that "reasonable efforts" have been made to "prevent or eliminate" the need for that removal, and, after a child has been removed from the custody of her parents, the State must demonstrate that it has made "reasonable efforts" to "reunify" the parent and the child. La. Ch. Code art. 682(A); **State, ex rel. D.T.**, 2008-2231 (La. App. 1 Cir. 5/15/09), 17 So.3d 31, 39. According to the Children's Code, "reasonable efforts" is defined as follows:

> "Reasonable efforts" means the exercise of ordinary diligence and care by the department throughout the pendency of a case pursuant to the obligations imposed on the state by federal and state law to provide services and supports designed and intended to prevent or eliminate the need for removing a child from the child's home, to reunite families after separation, and to achieve safe permanency for children. Reasonable efforts shall be determined by the particular facts and circumstances of each case, including the individualized needs of each child and the family, the imminence and potential severity of the threat of danger, the strengths of each child and the family, and the community of support available to the family. In making reasonable efforts, the health, welfare, and safety of the child shall be the paramount concern.

La. Ch. Code art. 603(26). After a review of the assessments, evaluations, services and programs made available to K.W. by the State in this case, we conclude that the

16

State exercised the required diligence and care as contemplated by the articles of the Children's Code in assisting K.W. toward the goal of reunification with C.W.

Moreover, we note that the State worked the case plan with K.W. longer than they were required to. As set forth in La. Ch. Code art. 1004.2:

> The department shall file and pursue to judgment in the trial court a petition to terminate the parental rights of the parent or parents if the child has been in state custody for seventeen of the last twenty-two months, unless the department has documented in the case plan a compelling reason why filing is not in the best interest of the child.

At the time of the trial, C.W. had been in the custody of the State and foster care for well over the required time. The record reveals that the case plan goal for K.W. changed several times over that time depending on K.W.'s behavior and participation in her case plan. The original case plan goal was reunification concurrent with adoption. In November 2022, the goal changed to adoption, but later changed back to reunification concurrent with adoption in February 2023. In October 2023, the goal was changed back to adoption, and the State filed the petition for termination on May 20, 2024.

The record evidence, including numerous reports from the State as well as from the Court Appointed Special Advocate Volunteer ("CASA") volunteer, reveals that while K.W. was exhibiting a pattern of behavior that appeared contradictory to one who desires to have her child returned home, C.W. was thriving in her foster home. In February 2023, the CASA volunteer observed C.W. to be a happy child capable of counting to 10 and saying her ABCs. She was also noted to have a close relationship with her foster mother's father, whom she calls "pawpaw." In August 2023, the CASA volunteer reported that C.W. has a very close relationship with her foster parent who she calls "momma." There is another foster child in the home that C.W. refers to as "sissy." In February 2024, the CASA volunteer reported that C.W. was very protective of her "sissy," always looking out for her and comforting her if

17

she is upset. C.W. was learning to write her name and learning her ABCs. She was observed to be an independent and curious child.

"There comes a point when the best interests of the children must be served by terminating parental rights in order to achieve permanency and stability for the children. ... [T]he focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parent to be terminated." **State ex rel. S.M.W.**, 2000-3277 (La. 2/21/01), 781 So.2d 1223, 1238. As noted above, K.W. has demonstrated an inability to comply with her case plan and continues to demonstrate an inability to make good, safe choices for herself and her child. C.W. has bonded with her foster family and is happy and progressing well. While the affection K.W. holds for C.W. is not in dispute, the evidence does not support a finding that her circumstances have sufficiently improved such that it would be in the best interests of C.W. for K.W. to retain her parental rights.

We have thoroughly reviewed the record in this matter and the history leading up to the State's petition for termination of K.W.'s parental rights. The record clearly and convincingly demonstrates that it was in the best interest of C.W. that K.W.'s parental rights be terminated and that C.W. be cleared for adoption. The district court's conclusion is supported by the evidence and, therefore, not manifestly erroneous.

### Termination of K.W.'s Parental Rights Based on Abandonment

Although only one ground for termination need be established, in this case the State also produced evidence that K.W. sought to terminate K.W.'s parental rights pursuant to La. Ch. Code art. 1015(4)(b), which provides, in pertinent part, as follows:

(4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under

circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

. . . .

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

The State argued that although K.W. was required to provide $25 per month towards the cost of C.W.'s care, she had not provided any financial contributions for C.W.'s care since she came into the State's custody on February 18, 2021.

K.W. argues on appeal that the State failed to prove that something other than poverty prevented her from offering support, citing **State ex rel. A.T.**, 2006-0501 (La. 7/6/06), 936 So.2d 79, 85 n.7 ("Further, poverty, and thus lack of support, cannot be the sole reason for terminating parental rights, there must be willful neglect in the failure of a parent to support his or her children."). She also argues that she struggled to find employment. However, a parent alleging lack of employment as just cause for her failure to pay child support must show not only that she was unemployed but that she was unemployable. **State ex rel. M.L.**, 2000-153 (La. App. 3 Cir. 5/3/00), 761 So.2d 103, 109.

At the termination hearing, K.W. testified that although she was aware that her case plan required that she pay $25 monthly towards C.W.'s care, she had not made any of the required payments. Rather, K.W. alleged that she contributed directly to C.W., believing that these contributions satisfied her obligation. According to K.W., she had been advised by the judge in a prior hearing that because she was pregnant, she did not have to make the $25 monthly payments as set forth in her case plan.

According to the record, the prior hearing K.W. is referring to is the August 2022 review hearing. At that hearing, the district court noted that K.W. was unemployed and had an infant—K.W.'s fifth child, A.W., born in April 2022. This

prompted C.W.'s attorney to note that although the State's system was reporting that K.W. was not making the monthly payments, the "food and other things" that she was bringing to the visits with C.W. was counted as contributions and that it was "not a mark against" K.W. that she was not making the payments. C.W.'s attorney also indicated that parental contributions are included in every case plan unless there is a request made by a parent's attorney to waive the contributions and that request is approved by the district court. There was no further discussion of the issue at that time.

Nonetheless, by the time of the termination hearing on July 15, 2024, almost two years later, K.W., who claimed to have maintained stable housing and employment since C.W. was removed from her custody, had still not provided proof of employment or her income to the State and had not complied with the requirement that she contribute to C.W.'s support. K.W. stated, "I've had two State tax jobs, but I've always had this where I make my own cash money income every week." At the time of the hearing, K.W. was working for a "little lady" doing whatever she needed done, including cleaning house and doing yardwork. K.W. stated that she had never been asked to verify her employment or to provide a pay stub, adding that her caseworker knows that she gets paid in cash.

As the district court indicated in its oral reasons for judgment, K.W. had offered no funds to help support C.W. since C.W. was taken into the custody of the State. Moreover, the district court noted that although K.W. suggests that she works for cash, she was unable to provide any information about her employment such as how many hours she is working, her salary, or how often she is being paid. Louisiana Children's Code article 1015(4)(b) sets a time period of six consecutive months of failing to provide significant contributions to the child's care. Based upon the record, K.W. failed to comply with providing significant support for C.W. for that time

period.[9] Therefore, we find no manifest error in the district court's finding that the State met its burden by clear and convincing evidence as to the allegations under La. Ch. Code art. 1015(4)(b).

*No Obligation to Consider Guardianship*

K.W. relies on comments made by the district court at the end of the termination hearing to support her position that guardianship should have been considered. The judge inquired about the process of becoming a guardian and the following colloquy occurred:

> [Counsel for E.C.]: The party that's receiving the guardianship, and in this particular case, [the State] would agree to the guardianship, and the court would render [an] order granting guardianship, which ultimately closes this case.
>
> The Court: It doesn't have to be [the State]. It could be a person who has legal custody of the child, right? So all of this talk, and this is another reason, all of this talk, and I don't buy it, that guardianship would be okay with the grandmother, who seems to be a nice, dedicated person. I believe it when she says no drinking, no dope in the house. I absolutely believe it. But, you know, three and a half years ago, [K.W.], with a whip of a pen, could have signed guardianship papers, and grandmother would have guardianship today. [The State] may have never been involved if they agreed to it. But [K.W.] has not pursued that at all. No, no, sir. The case is over. She's not pursued that. She hasn't gone to her mother or to an attorney and said I want to give guardianship of my child to my … mother.
>
> [Counsel for E.C.]: Your honor, at this point, once [the State] has custody, she can not -- she no longer has custody, so she doesn't have the authority to grant it to anyone.
>
> The Court: You know what? I bet you, if you had a hearing on that issue, something could have been different. My point is there was no real effort to do that. There's no effort. And that also weighs on her credibility.

As previously discussed, when C.W. was in the care of her paternal grandmother early on in this case, there were some issues with visitation between

---

[9] We note that A.W. was placed into the State's custody on November 17, 2022, for neglect/dependency and lack of supervision. On May 20, 2024, the district court agreed to the recommendation that guardianship of A.W. be given to his maternal grandmother. Thus, as of November 17, 2022, caring for an infant should no longer have hindered K.W.'s ability to find employment and make parental contributions to C.W.'s care.

the grandmother and K.W. At a hearing in June 2021, the district court determined that due to the animosity between the parties and looking at the best interests of the child, C.W. should be removed from placement with her paternal grandmother as soon as possible. The district court further ordered that there would be no family placement, on either side, and that the State should find a "disinterested third-party foster" to care for C.W. while the parents worked the case plan.

From the time of this order in June 2021 until the termination hearing in July 2024, there is no evidence in the record to suggest that K.W. ever inquired again about the issue of guardianship or that the issue was discussed at any meetings with the State or in any of the many hearings before the district court. It was not until the termination hearing that both K.W. and her mother R.G. indicated they would like C.W. to be placed with R.G. Again, by this time, C.W. had been in the State's custody for over three years, living a well-adjusted life in a very loving foster home.

Contrary to K.W.'s argument on appeal, the district court was under no obligation to consider guardianship prior to terminating K.W.'s parental rights. Guardianship is intended to provide a permanent placement when reunification or adoption is not in the children's best interests. La. Ch. Code arts. 718, 722. As we have already concluded, the record supports a finding that termination of K.W.'s parental rights is in C.W.'s best interests and that C.W. should be freed for adoption by her foster parent.

## CONCLUSION

The primary concern of the courts and the State in these cases is to secure the best interest for the child, including termination of parental rights if justifiable statutory grounds exist and are proven. In this case, the State proved by clear and convincing evidence the grounds for termination under La. Ch. Code article 1015(4)(b) and (5) and that termination was in the best interest of the child. These findings are clearly supported by the record and are reasonable in light of the record

22

in its entirety. Accordingly, we affirm the district court's July 29, 2024 judgment terminating K.W.'s parental rights and freeing C.W. for adoption. All costs associated with this appeal are assessed against K.W.

**AFFIRMED.**

23